## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In Re Application of Daniel Snyder )<br>For an Order Directing Discovery from )<br>Moag & Co., LLC Pursuant to )<br>28 U.S.C. § 1782 )<br>_____ ) | Case No.   20-CV-02705-ELH |

## DECLARATION OF JOHN ANDREW MOAG, JR.

I, John A. Moag, swear under the penalty of perjury that the following, to the best of my personal knowledge and belief, is true and correct.

1.      I am Chairman and CEO of Moag & Company, LLC, a firm comprised of me and three other employees, which has represented both sellers and buyers of professional sports teams since 2001.  A resident of Baltimore, Maryland since childhood and a graduate of University of Baltimore Law School, for more than two decades our Baltimore-based firm has handled dozens of assignments (including representing the NFL and the NBA on financial and ownership issues). We enjoy a reputation for our experience, integrity, discretion, and success.

2.      To date, I have never sued anyone, and have never been sued. I once gave a short deposition, about 25 years ago, relating to my role in bringing the Baltimore Ravens to Baltimore.

3.      The Snyder Petition, which wasn't provided to my counsel or me until November 24, 2020, more than two months after this matter was filed and docketed, but which was provided to the press, even before filing with the Court, led to a September 15 story that falsely accuses me of participating in a conspiracy to tarnish the Snyder reputation by leaking, or otherwise knowing about or supporting allegations from an online tabloid that I had never heard of until its July 16, 2020 publication. The link to article quoting directly from this Snyder-leaked Petition, is found at

https://frontofficesports.com/sports-investment-firm-latest-target-of-dan-snyders-legal-team/

1

4.      I say "Snyder-leaked" because no one outside the Snyder team had the document. The Court would never knowingly allow the leak of an "under seal" filing, and, I didn't leak it, or even know what it said. As the Court can confirm from the link, the reporter, who bragged about having a copy of the not-yet-docketed Snyder petition, direct-quotes from Snyder's secret petition. As explained more fully below, this is but one of multiple instances in which the Snyder team, in my humble opinion, is abusing the litigation process.  Here, a procedure intended to aid foreign litigation discovery, instead, and unbeknownst to the court, is being used in a blatantly obvious media campaign.  I believe Snyder knows that accusing me of having anything to do with the India Litigation allegations is false, and is attempting to tarnish my reputation, believing that it somehow deflects attention away from his other problems. I also believe my association with his fellow shareholders is motivating Snyder to attack me, and/or to seek information about issues having no remote relationship to the allegations in litigation in India.

5.      To be crystal clear, I know nothing about the two so-called India Litigation allegations, one connecting Snyder to Jeff Epstein and the second to sex trafficking. I was shocked to read those allegations, and had never seen or heard about them before their July 16, 2020 publication.  Further, I have no knowledge of the allegations' source. And, while I have no firsthand knowledge, I believe those allegations are false. I understand that Snyder's counsel has complained that our production, which so far has been 122 pages, is "meager."  Let me again be clear: as it relates to the sourcing or my knowledge of any aspect of the India Litigation allegations, there literally are zero documents that I can or have produced, because no such documents exist. Documents we've produced are simply responsive to search terms provided by the Snyder team, which my counsel suggested, in order to be helpful.

6.       To provide the Court background that explains why Snyder might be attacking me for other reasons, or want from me information having nothing to do with the India Litigation, four years ago, in 2016, Fred Smith, Founder, Chairman & CEO of Federal Express, engaged me to sell his 10% interest in the Washington Football Inc. ("WFI," then known as the Washington Redskins).   We succeeded in finding an acceptable buyer, who Mr. Smith introduced to Dan Snyder. The two then met in Aspen, CO.  Snyder represented he would take the lead in proposing the buyer's approval for ownership, but never did, leading that interested buyer to acquire a 10% interest in a different franchise.

7.       While still retained by Mr. Smith, in 2019, Moag & Company's representation expanded to include two other minority owners, Robert Rothman and Dwight Schar. As such, Moag & Company was  engaged to sell slightly over 40% of WFI.  At the time of this engagement, I was aware of no animosity between Snyder and my clients.  Indeed, Snyder and I had pleasant conversations, including his offer, in effect, to "help in any way I can."  Moag & Company's representation, among other things, involved routine business-related communications with prospective buyers and others.   Given Snyder's role as majority owner, those confidential, business-related conversations which sometimes mentioned Snyder, had nothing to do with the Indian Litigation.

8.       In the course of this representation, my clients learned of some serious corporate irregularities in the WFI 2019 financial statements which I alluded to in a call I had with Snyder in late September 2020, including long missing financials, breaches of the partnership agreement, and other significant issues, some now being litigated in Judge Messitte's court, and others in ongoing arbitration.   To say that discovering these improprieties disturbed my clients is an understatement. While there are details to which I am not officially privy to in litigation my clients

filed against Snyder for these serious irregularities, a leaked <u>The New York Times</u> story by Ken Belson cited sources that claim, inaccurately, that my clients were motivated by a desire for distributions.    (*See*  *https://www.nytimes.com/2020/09/25/sports/football/washington-nfl-team-owners-dan-snyder.html?searchResultPosition=1*).  The opposite is true.  In a Belson email to me hoping for comment from me (which I refused), Belson also confirmed that he too had accessed a leaked copy of the Section 1782 Petition filed against me, again which I did not see until more than 2 months later.  The Petition reported alleged statements attributed to me indicating to the Court that I had advanced warning of the July 16, 2020 articles published by the Indian website. That is patently false. To summarize, the truth of what Snyder and I have both known for many months    about    corporate    improprieties    is    increasingly    coming    out.    *See* https://www.washingtonpost.com/sports/2020/12/19/dan-snyder-minority-owners-feud/; https://www.washingtonpost.com/opinions/dan-snyder-promised-transparency-about-his-teams-work-culture-why-are-there-still-so-many-secrets/2020/12/25/19d5f2aa-4564-11eb-a277-49a6d1f9dff1_story.html.

9.      In responding to discovery in this proceeding, as to the first six persons/entities I was given search terms for, all India-related, I have thoroughly searched (beginning with the first of the six, which is MEAWW), and have re-confirmed that we have nothing responsive to those search terms. Nor would we, given we knew nothing about the Indian allegations before they were published.  Apart from derivations of the Dan Snyder name, two additional search term names were provided by Snyder when my attorney suggested that might aid in our search: a Mary Ellen Blair, and a Bobby Potter—names not previously mentioned before my attorney's request for same. I would be very surprised if Snyder has any credible basis for connecting either Blair or Potter to anything even remotely relating to knowledge about the India allegations before July 16,

or their source(s), yet the Snyder papers to this Court reference these two at least 73 times (44 for

Blair and 29 for Potter). Snyder has not sued or even deposed either Blair or Potter. Nor unless

very recently, has Potter even been contacted, and the Section 1782 Petition filed against Blair has

been closed, according to her counsel.

10.     As to Ms. Blair, Snyder's lawyer falsely states under oath that I participated in a

conspiracy with her that began with a phone communication with her on July 7.  I never had any

such conversation, and, despite their sworn representations to this Court otherwise, Snyder and his

counsel know this. The only reason Snyder would make up this phantom July 7 phone call would

be to mislead the Court into believing I was connected somehow, or knew something beforehand,

about the July 16 MEAWW story, or that this story was the only negative issue Snyder was then

confronting. Nothing could be more untrue, as the Court can now confirm because it now is out in

the public—some by court order.  I never heard of MEAWW or its allegations prior to the July 16,

2020 day of the publication, when I was referred to it. And, when I read it, I dismissed it as an on-

line tabloid not unlike an internet version of the National Enquirer.  As the papers I've produced

in this matter confirm, because of all the sensationalism surrounding sports, I almost never talk to

the press. The press knows this, and my clients know this. As to Mary Ellen Blair, I did not know

her, or speak to her, until August 4, 2020, when she called me on the first of two occasions, each

time to discuss the subject of my next paragraph.

11.     On Saturday, August 1 at about 8:30 am, my wife, from the lower level of our home

in Baltimore, called up to me saying that two strangers were at the front door to see me.  At the

door I saw two men, wearing no masks, and asked what they needed. I didn't know at the time but

have since confirmed that they had been hired by Snyder (who is now under instruction from the

NFL to cease these intimidation tactics). In a menacing manner the two flanked me when I stepped

out, moving in tandem whenever I shifted. They began, not with introducing who they were, but more provocatively, with "you're John Moag who is selling part of the Redskins." When I asked who they were, instead of identifying themselves, they responded with words to the effect of "That's not important. We represent a client interested in the Redskins and we'd like to know what you are saying about the Redskins and the owner, and what you think of the media about him on the internet." In no uncertain terms, I ordered them off my property, and later informed my clients about this visit, which led to a call informing me that a former Snyder employee named Mary Ellen Blair, had had a similar encounter, written up in the papers, when followed to the grocery store in Washington, D.C. I said it was fine if she wanted to call and compare notes, describing these two, which she did, twice. Her description matched the two who had intruded on my doorstep, and she was also able to get the name of one of the intruders, allowing me to further confirm the match with Facebook photos. As Snyder knows, I informed the NFL's General Counsel of those visits, and of Ms. Blair's two calls to me, who had told me she knew of others who had been visited by the same intruders. (*See* https://www.washingtonpost.com/sports/2020/09/04/dan-snyder-private-investigators-nfl/) **Apart** from Ms. Blair's two calls in early August, I have never exchanged any calls, texts or emails, or other communications with Ms. Blair. As stated above, the sworn affidavit representation by Snyder's counsel found at ECF 13 #3, claiming that I communicated with Blair on July 7, is a false statement, and Snyder's counsel will not be able to produce any credible evidence for this false statement. Concluding on Ms. Blair, Snyder has the two August 2020 Blair-to-Moag phone call entries (*see* MOAG000077-MOAG000078), and nothing else exists. But it now is clear that having any association with any Washington Football Team ("WFT") minority shareholder, no matter what the connection, be it as a former WFT employee like Mary Ellen Blair, or a financial

advisor   like   me,   will   subject   you   to   the   Snyder   team's   attack.   *See*
https://www.washingtonpost.com/sports/2020/12/23/daniel-snyder-response-allegations/.

12. On Mr. Bobby Potter, I have also produced everything I have relating to communications

with him. (*See* MOAG000002-MOAG000003; MOAG000019;  MOAG000020-MOAG000022;

MOAG000067-MOAG000068;     REVISED     MOAG000075;     MOAG000077     AND

MOAG000085.) Mr. Potter called me on July 7, 2020, our first contact, stating that he had buyers

interested in the WFT.  We had a few conversations, but nothing serious, when it became clear

that he was unable to produce a signed nondisclosure agreement.  While they are no longer

retrievable, notwithstanding my efforts in direct contact with Verizon, I know that I had text

exchanges with Mr. Potter, which I would send and receive from my iPhone. As my counsel has

conveyed to Snyder counterparts, I routinely delete all text messages unless needed for business

records.  On Saturday, December 13, for the first time, I saw some messages on my iPad (which

I have never used to send or receive messages). I immediately informed my counsel of this and

was told to try to photograph the messages before the messages synced with iPhone deletions.  I

did that, and, while none of these texts have anything to do with the Indian Litigation, these

photographed messages (12) have been added to our fourth production, and Bate-stamped

MOAG000123-MOAG000134, which, when added to additional production described below,

bring the total produced to 160 or MOAG000160.

13.     The only limitation is that unless I saved a text, which I generally do not do, I do

not have access to texts or office phone records beyond the past 3 months. To the best of my

knowledge and ability, given phone company limitations on what can be retrieved in the way of

telephone and text messaging, we have produced everything we could reconstruct relevant to the

search terms provided by Snyder's counsel. While I never listened to it, there was one July 7

voicemail from Mr. Potter, introducing himself, and the belief that he had a potential buyer for the WFT.

14.     We are now making our fourth production here; the sur-reply papers recount some of our efforts undertaken in making our second and third rolling productions (*see* ECF 16).  To be as clear as I can, I believe that as of December 2, 2020, with our third production of documents (through MOAG000122), Moag & Co. had produced all responsive records we were able to then locate—but none related in any way to the Indian Litigation. For months, our firm's three employees and I have been working remotely. The computers we use are basic models.  Despite pandemic challenges, as my employee Nate Wilson's Affidavit explains (attached as Exhibit A), I asked him to try to find a willing outside expert to join him in the office last week.  I believe a review of everything we have produced, including our fourth production on December 28, 2020, will reinforce the fact that neither my company nor I know anything about the July 16, 2020 Indian case allegations, or anyone who does. Therefore, while, what now totals 160 documents produced (as Bates stamped for Petitioner's convenience as MOAG000001-MOAG000160, is technically responsive to Snyder's demands, nothing we have, or could ever produce, will have any remote bearing on the India Litigation allegations, or their sourcing.

15.     I find it distasteful recounting bad press about Snyder in this declaration, but I do include a small sampling of it here, because it confirms that the Indian allegations are but a tiny part of an untold number of negative reports about Snyder that are almost daily published in major national newspapers and smaller ones as well.  Without knowing about this press, to read Snyder's one-sided Section 1782 Petition would leave the Court to believe that the India-related bad publicity was all there was.  In fact, reports including both business and personal improprieties are now    being    publicly    reported    and    have    become    front-page    news,    *see*

https://www.washingtonpost.com/sports/daniel-snyder-sexual-misconduct-settlement/2020/12/22/f81131d8-4339-11eb-a277-49a6d1f9dff1_story.html);
https://www.washingtonpost.com/sports/2020/12/23/during-daniel-snyders-ruinous-reign-theres-always-another-shoe-ready-drop/), and the lead editorial on Sunday, December 27, by the Washington Post Editorial Board (https://www.washingtonpost.com/opinions/dan-snyder-promised-transparency-about-his-teams-work-culture-why-are-there-still-so-many-secrets/2020/12/25/19d5f2aa-4564-11eb-a277-49a6d1f9dff1_story_.html (in print Dec. 28, 2020).   While I monitor news about team ownership for clients, my stock-in-trade are honest, factually accurate numbers related to business transactions, and closing transactions for my clients. As I told Snyder when we spoke, I have no interest in the non-business-related publicity, but knew and very much cared about what I was hearing concerning serious financial and corporate irregularities, some, but by no means all, of which were alluded to in another recent Washington Post feature article on Sunday, December 20, 2020 (in print) (see https://www.washingtonpost.com/sports/2020/12/19/dan-snyder-minority-owners-feud/).   While the Court would not have known about this, I did, Snyder did, and the Snyder team did, and have, for many months. When I first saw the contents of the Section 1782 Petition, two months after it was filed, I was astonished to confirm that the Petitioner was urging this Court, in justification of allowing discovery, to connect "anticipated negative publicity" to the sex-trafficking and Jeffrey Epstein allegations of the Indian Litigation. Given the serious issues that have been simmering and which Snyder has known about for many months, including (but hardly limited to) (a) mismanagement of the WFT, (b) corporate irregularities, (c) the then secret but now public 2009 settlement for sexual harassment, and (d) reports, lawsuits, and investigations about mistreatment of Team cheerleaders, the Snyder Petition, to put it bluntly, is worse than a tortured stretch.   Petitioner and his attorneys for months have known about these matters.

**9**

16.     While I was unable to get it from the Court, shortly after the Snyder Petition was first quoted from directly by the press (on September 15, 2020), I spoke by phone with Snyder (and, later, at Snyder's attorney's request, with Snyder's personal confidante, Greg Owen), forewarning each of them that, while I didn't believe and cared nothing about the scandalous India Lawsuit allegations, I had for many months known about serious corporate malfeasance issues that neither I nor my clients have disseminated, and weren't then in the press.  I warned and they seemed to agree that discovery relating to me, if not limited to the Indian Litigation, could harm both Snyder and my clients.  Snyder and Owen seemed almost relieved I was focused only on business-related issues, which I found strange at the time, but reading the December 23, 2020 front page       Washington       Post       and       sports       page       stories,       (*see* https://www.washingtonpost.com/sports/daniel-snyder-sexual-misconduct-settlement/2020/12/22/f81131d8-4339-11eb-a277-49a6d1f9dff1_story.html       and https://www.washingtonpost.com/opinions/dan-snyder-promised-transparency-about-his-teams-work-culture-why-are-there-still-so-many-secrets/2020/12/25/19d5f2aa-4564-11eb-a277-49a6d1f9dff1_story.html), confirms to me that "corporate malfeasance" was perhaps of far less concern to Snyder, and referred to him as "business litigation, which happens, all the time."

17.     Bad publicity about Snyder can seriously harm the minority shareholders, and me, because it turns off willing, qualified buyers. Potential buyers always care about the character and reputation for fair dealing of a potential co-owner, particularly one like Snyder, who has controlling shares. Bad publicity also can devastate the value of a franchise for potential buyers. In closing here, prior to their July 16, 2020 publication, I knew nothing about the India Litigation allegations about Dan Snyder, or the source of those allegations, and I still know nothing about those allegations. Nor do I believe them to be true, but the fact that they are out there poses serious

harm to my clients' best interests, and to me as their confidential advisor. I have not, and would never promote such allegations.

18.     My attorneys are endeavoring to revisit the 12/17/20 Order. They, and I want to continue to be responsive, but searching for evidence of something I know doesn't exist is frustrating. Upon reading the Magistrate's Order, I tasked Nate Wilson, one of my three employees charged with trying to oversee technical support during coronavirus, to try during Christmas week, to find outside technical support willing to come to our office and do a search of my company server and computer for any records not previously retrievable regarding the search terms mentioned above. While we've all been working remotely due to Covid-19, Nate Wilson has prepared a sworn Affidavit recounting the further efforts we have taken to respond to Snyder's discovery requests.

19.     I also directed my employees to contact Verizon and Comcast to request copies of my phone records during the time period requested, which they did, but were told that Verizon maintains text messages on its servers for only five (5) days. We were, however, able to access my cell phone calling records for the period needed to be responsive.  My office line is serviced by Comcast, but the office does not receive paper copies of Comcast bills. A second of my three employees, Tom Lang, upon asking Comcast directly for copies, was told that Comcast maintains phone records for 90 days only.  As of December 2, 2020, we produced all Comcast and Verizon records that were retrievable, with redactions of personal numbers having nothing to do with the Indian Litigation or the search terms provided.

20.     One final point I hope is understood which is relevant to motives, is that sale of Mr. Snyder's interests in conjunction with my clients' interests very likely would totally eliminate any payment to me for my consultancy and work on behalf of my three minority shareholders. So, the

idea that I somehow would contribute to a forced Snyder sale not only is factually untrue—it is preposterous, and completely contrary to my personal interests. I don't represent Snyder, I represent Mssrs. Smith, Schar and Rothman.  If Snyder as controlling partner sold the entire team I would no longer have a client; Snyder would most assuredly not hire me.


I have read this Declaration before signing it, all of which, unless otherwise indicated, is based upon my personal knowledge, information and belief, and swear under the penalty of perjury that the foregoing is true and correct.

12/28/2020
Date

John A. Moag, Jr.