UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Application of Daniel Snyder for an Order Directing Discovery from Verizon Communications, Inc. Pursuant to 28 U.S.C. § 1782 | Misc. Action No.<br><br>*Ex Parte* Petition for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 |

Based upon the annexed Declaration of David Murphy, Esq., dated January 15, 2021 ("Murphy Decl."), petitioner Daniel Snyder ("Mr. Snyder" or "Petitioner") respectfully petitions this Court *ex parte* for an Order pursuant to 28 U.S.C. § 1782, compelling Verizon Communications, Inc. ("Verizon," or "Respondent"), a corporation residing in this District, to provide discovery for use in a proceeding currently pending in India.

I. INTRODUCTION

1. Petitioner seeks limited discovery from Respondent in aid of litigation currently pending in The High Court of Delhi at New Delhi (the "Indian Court"), bearing the caption *Daniel Snyder Through His SPA Holder vs. Eleven Internet Services LLP & Ors.*, filed on August 7, 2020 (the "Indian Action").

2. The Indian Action arises from the publication of a series of false and defamatory "news" articles targeting Petitioner on the MEA WorldWide website, located at www.meaww.com ("MEAWW"). The articles contain flagrantly false statements about Petitioner, including but not limited to accusing Petitioner of sexual misconduct, such as involvement in sex trafficking, and a purported affiliation with sexual predator Jeffrey Epstein.

3. In the Indian Action, Petitioner asserts claims for defamation *per se* against the authors of these articles, as well as Eleven Internet Services LLP ("Eleven") which, upon

information and belief, directed the publication of those false and defamatory articles on behalf of hidden third-party clients.

4. Petitioner has learned through discovery received in a third-party proceeding currently pending in the United States District Court for the District of Maryland, captioned *In re Application of Daniel Snyder for an Order Directing Discovery from Moag & Co. LLC Pursuant to 28 U.S.C. § 1782* (Civil Action No. 1:20-cv-02705-ELH), that Maryland resident Mr. John A. Moag, Jr. is a customer of Verizon (with an account ending in -0001) and used his cellular phone to make and receive phone calls, and to send and receive text messages, that are highly relevant to Petitioner's claims in the Indian Action.

5. Specifically, Mr. Moag is the principal of Moag & Co. LLC ("Moag & Co."), a boutique sports investment banking firm that was engaged by the minority owners of the Washington Football Team (the "Team") – of which Petitioner is the majority owner – to solicit offers for selling their ownership interest in the Team. Shortly before the Defamatory Articles were published, Mr. Moag approached a third-party to see if that third party would be interested in purchasing the minority owners' interests in the Team. When the third-party indicated that the third-party would only be interested in purchasing a majority stake, Mr. Moag stated that Petitioner would soon be forced to sell his majority share in the Team based upon the imminent release of negative information concerning Petitioner.

6. Even after the publication of the Defamatory Articles (as defined herein), Mr. Moag repeated to another third-party that further negative public information about Petitioner was forthcoming.

7. Mr. Moag could only have known this information if he was aware of the upcoming Defamatory Articles and/or other negative press about Petitioner, and thus has relevant information

concerning the campaign to spread corrupt disinformation regarding Petitioner – including those individual(s) who hired and directed Eleven and MEAWW to publish their defamatory articles about Petitioner.

8. On September 15, 2020, Petitioner petitioned the District Court of Maryland, pursuant to 28 U.S.C. 1782, for the issuance of document and deposition subpoenas directed to Moag & Co. The District Court of Maryland granted Petitioner's request on September 29, 2020. *See* Murphy Decl., Ex. A.

9. After duly serving Moag & Co. with the document subpoena seeking, among other things, phone records reflecting communications between Moag & Co. – of which Mr. Moag is the principal – and third parties, to the extent such communications concerned Petitioner, Moag & Co. admitted that Mr. Moag's Verizon phone records were responsive to Petitioner's request, but has refused to provide full and unredacted copies of those documents.

10. Accordingly, Petitioner believes Verizon is in possession, custody and/or control of Mr. Moag's phone call records, text histories, and phone bills associated with the phone number ending in -9992[1] that contain relevant information concerning the same campaign of defamation against Petitioner, which included the publication of the subject Defamatory Articles (as defined herein) that are at issue in the Indian Action. The limited *Subpoena Duces Tecum* that Petitioner seeks to serve on Respondent is attached to the Murphy Decl. as **Exhibit B**.

11. The documents and information in Respondent's possession, custody and/or control indisputably will aid the Indian Court in resolving Petitioner's defamation claims.

---

[1] For privacy purposes, Petitioner will exclude Mr. Moag's full phone and Verizon account numbers from the instant application and proposed subpoena. However, if Petitioner's application is granted, Petitioner will provide these numbers in full and unredacted form to Verizon to assist in locating the relevant records.

12. As discussed herein, Petitioner meets all the statutory criteria for the issuance of an order allowing the requested discovery. *See* 28 U.S.C. § 1782. Additionally, all the discretionary factors that this Court may consider favor granting this Petition. Petitioner thus respectfully requests that his Petition be granted.

13. Notably, in addition to the previously discussed Section 1782 proceeding against Moag & Co., five other district courts have recently granted Petitioner's requests for Section 1782 discovery in aid of the Indian Action against parties believed to be involved in the corrupt misinformation campaign being waged against Petitioner:

- **United States District Court for the Central District of California**: *In re Application of Daniel Snyder for an Order Directing Discovery from New Content Media Inc. d/b/a MEA WorldWide Pursuant to 28 U.S.C. § 1782* (C.D. Cal., Misc. Action No. 2:20-mc-00076);

- **United States District Court for the Eastern District of Virginia**: *In re Application of Daniel Snyder for an Order Directing Discovery from Mary Ellen Blair and Comstock Holding Companies, Inc. Pursuant to 28 U.S.C. § 1782* (E.D.Va. Misc. Action No. 1:20-mc-00023-LO-TCB);

- **United States District Court for the District of Maryland**: *In re Application of Daniel Snyder for an Order Directing Discovery from Shawn Ferguson Pursuant to 28 U.S.C. § 1782* (D. Md., Case No. 1:20-cv-03299-ELH);

- **United States District Court for the District of Colorado**: *In re Application of Daniel Snyder for an Order Directing Discovery from Jessica McCloughan and Friday Night Lights LLC Pursuant to 28 U.S.C. § 1782* (D. Col., Case No. 1:20-mc-00199-NRN); and

- **United States District Court for the Southern District of Texas**: *In re Application of Daniel Snyder for an Order Directing Discovery from Precision Creations LLC Pursuant to 28 U.S.C. § 1782* (S.D. Tex., Case 4:20-MC-02665); *In re Application of Daniel Snyder for an Order Directing Discovery from The Ardent Group LLC Pursuant to 28 U.S.C. § 1782* (S.D. Tex., Case No. 4:20-mc-02867).

## II. PARTIES TO THIS PETITION

14. Petitioner Daniel Snyder is a businessman and philanthropist best known for his majority ownership of the Washington Football Team, and is an adult individual and a resident of the state of Maryland.

15. Verizon Communications Inc. is a corporation and phone service provider having a principal place of business in this District at One Verizon Way, Basking Ridge, New Jersey 07920.

## III. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this application under 28 U.S.C. §§ 1331 and 1782.  This Court has personal jurisdiction over Respondent because it resides in the State of New Jersey and in this Judicial District.

17. Under 28 U.S.C. §§ 1391(c) and 1782, venue is proper in this Judicial District because both Respondent resides in this District.

## IV. THE INDIAN ACTION

### A. Parties to the Indian Action

18. Petitioner has asserted a claim for defamation *per se* in the Indian Court against Indian company Eleven Internet Services LLP, and its Indian subsidiary MEAWW, as well as Indian residents Anay Chowdhary ("Anay") and Nirnay Chowdhary ("Nirnay"), Prarthna Sarkar ("Sarkar") and Jyotsna Basotia ("Basotia").

### B. The MEAWW Website and the Defamatory Articles

19. MEAWW purports to be, and holds itself out as, a news website.  MEAWW publishes "news" stories regarding a broad variety of matters, including pop culture, law and government, and media and entertainment.

20. In reality, however, rather than being legitimate news sources and reporters, MEAWW intentionally sows disinformation at the behest of its undisclosed clients, including governments and intelligence services, and often is hired by clients that are cloaked behind several layers of anonymous corporate entities. MEAWW thus acts as a hired agent of these unnamed entities to knowingly spread, among other things, false and defamatory statements concerning its clients' rivals.

21. MEAWW has worldwide reach, as it publishes globally via the internet and receives internet traffic from the United States, India, and many other countries around the world. It has touted itself as having more than 150 million unique users and more than 1 billion page views per month.

22. On or about July 16, 2020, MEAWW posted several false and wholly fabricated articles — written by Sarkar and Basotia, and published at the direction of the Chowdhary brothers — regarding Petitioner, which falsely accuse him of a broad array of acts of criminal sexual misconduct including, among other things, involvement in sex trafficking, and affiliating with sexual predator Jeffrey Epstein (collectively, the "Defamatory Articles").

23. These included "Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list," published at https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reaction (the "First Defamatory Article"). The First Defamatory Article falsely states that Mr. Snyder "has found himself in trouble yet again and this time it's allegedly for sex trafficking. The minority owners [of the Washington Football Team] are apparently looking at bringing him down citing inappropriate and unchaste behavior as one of the major reasons." The First Defamatory Article went on to publish utterly baseless speculation

regarding whether a then-forthcoming *Washington Post* article about the Washington Football Team "would be about [Snyder's] alleged involvement in sex trafficking[,]" quoting several anonymous posters from the internet forum Reddit.com, including baselessly quoting that "[Snyder] is getting [arrested] for sex trafficking. He was on [Jeffrey] Epstein's list too." *Id.*

24. MEAWW published a second article on July 16, 2020: "#RedskinsScandal: Will Dan Snyder rename Washington Redskins the 'Epsteins'? Angry Internet screams 'throw him out," published at https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change (the "Second Defamatory Article," and together with the First Defamatory Article, the "Defamatory Articles"). The Second Defamatory Article refers to, and repeats, the false allegations of the First Defamatory Article: namely, the false claims that Mr. Snyder is linked to sexual predator Jeffrey Epstein and that Mr. Snyder is or was involved in sexual misconduct, including sexual harassment and/or sex trafficking.

25. These blatantly false and wholly fabricated articles purport to be factual news stories, but were and are utterly untrue and have no legitimate journalistic basis whatsoever.

26. However, although MEAWW publicly named "the internet" as its source for the false and libelous statements in the Defamatory Articles, upon information and belief certain individuals either furnished, or procured for, the defendants in the Indian Action false and unsubstantiated claims regarding Mr. Snyder in connection with MEAWW's drafting of the Defamatory Articles.

27. The statements that MEAWW published about Mr. Snyder are categorically false. Moreover, the defendants in the Indian Action published these defamatory, inflammatory statements about Mr. Snyder with deliberate intent to damage Mr. Snyder, or at best, complete disregard for their basis in fact.

28. Although MEAWW reluctantly removed the Defamatory Articles after Petitioner demanded their immediate removal, the damage to Mr. Snyder's reputation had already been done.

29. Mr. Snyder's children and other family members, and numerous of Mr. Snyder's friends, neighbors, and business associates, were exposed to the Defamatory Articles, either by directly viewing the Defamatory Articles online or by receiving word of the Defamatory Articles. Consequently, Mr. Snyder's reputation and good standing has been severely harmed, and will continue to be harmed, by the Defamatory Articles, and the members of Mr. Snyder's family have been severely harmed due to the publication of these lies on behalf of hidden third-party clients of MEAWW.

30. The false allegations that the defendants in the Indian Action have seeded on the internet have taken root beyond MEAWW itself. For instance, on or about July 16, 2020 – not coincidentally, the very same day that MEAWW published the Defamatory Articles at issue herein – the following appeared on a Twitter account that has been confirmed as a fake account existing for no purpose other than to propagate false and misleading information:

> According to insiders and anonymous Washington Post employees, the [upcoming] article will allege that: Dan Snyder abuses drugs and alcohol[;] Snyder paid off refs. Some refs have made $2 million from him. And Snyder is not the only team owner paying off refs. Others do it too. Snyder and former Redskins coach Jay Gruden, brother of Jon Gruden, pimped out their cheerleaders to season ticket holders while holding their passports from them in a foreign country. Jay Gruden and then Redskins running back Kapri Bibbs were sleeping with the same woman. When Jay found out, he got petty and benched Bibbs. During that game when Bibbs was on the bench, Bibbs' replacement missed a block and that resulted in quarterback Alex Smith suffering a broken leg. Alex hasn't been able to play football ever since[.] Snyder and Gruden would hold sex parties with rampant drug usage and some sexual assaults[.] Snyder held nude photoshoots with the Redskins cheerleaders[.] Lawyers are already involved[.]

Whether this account is one of the "bots" utilized regularly by MEAWW to further propagate its for-profit lies, or written by a human agent of MEAWW, will be further elucidated through discovery sought herein.

31. Petitioner commenced the Indian Action on August 7, 2020, asserting claims for defamation *per se* arising out of the Defamatory Articles. Petitioner seeks damages of $10 million.

V. **MR. JOHN A. MOAG JR. DEMONSTRATED KNOWLEDGE OF FORTHCOMING FALSE AND DEFAMATORY ARTICLES WELL IN ADVANCE OF THEIR PUBLICATION, AND USED THAT INFORMATION FOR ITS AND ITS CLIENTS' PERSONAL GAIN**

32. As noted *supra*, Mr Moag is the principal of Moag & Co., which the minority owners of the Team retained to attempt to sell their minority shares. In connection with this engagement, Mr. Moag approached potential purchasers for the minority shares.

33. On or around July 9, 2020, Mr. Moag contacted a third-party to solicit an offer for the minority shares in the Team. When the third-party stated that the third-party was only interested in a majority stake in the Team, Mr. Moag stated that Petitioner also would soon be selling his interest in the Team. When the potential buyer challenged Mr. Moag and noted that based on the third-party's knowledge it was unlikely Petitioner would be selling his interest in the Team, Mr. Moag responded that Petitioner would have no choice but to do so soon thereafter due to negative information that would be released imminently. Of course, the Defamatory Articles were published one week later, on July 16, 2020.

34. Further, the very next day – on July 17, 2020 – Mr. Moag spoke with a different third party and once again suggested that Petitioner would be forced to sell his interest in the Team due to further upcoming negative press. The Defamatory Articles were amplified on numerous other platforms in the days following their original publication.

35. Additionally, numerous negative Tweets concerning Petitioner that are believed to have originated from fake accounts were posted in the days following Mr. Moag's July 17 statements. *See, e.g.,* Twitter post, dated July 17, 2020, by @AgentKellermanp ("We need to shed more light on Dan Snyder pimping out the cheerleaders, they also need to have their voices heard

so we could get him a one way ticket to Guantanamo Bay.") (*accessible at* https://twitter.com/AgentKellermanp/status/1284261972758978560); Twitter post, dated July 18, 2020, by user @Username02_tx ("Really don't think Dan Snyder should just be allowed to say 'Sorry, I had no idea this was happening.' and remain owner of the team when just a few years ago his organization was accused of using their cheerleaders as escorts.") (*accessible at* https://twitter.com/Username02_tx/status/1284518620375195648).

36. For all of the foregoing reasons, it is apparent that Moag had advanced warning of the MEAWW articles, and thus has information relevant to the Indian Action.

### VI. PETITIONER SUCCESSFULLY BRINGS SECTION 1782 PROCEEDING AGAINST MOAG & CO.

37. On September 15, 2020, Petitioner commenced a proceeding pursuant to 28 U.S.C. Section 1782 in the United States District Court of the District of Maryland against Mr. Moag's company, Moag & Co., to seek discovery in aid of the Indian Action.

38. Pursuant to a court order dated September 29, 2020, Petitioner's application for the issuance of subpoenas directed to Moag & Co. was granted. Murphy Decl., Ex. A.

39. Petitioner duly served Moag & Co. with a document subpoena on October 19, 2020, seeking, among other things, "[a]ll Documents and Communications between [Moag & Co.] and any third party concerning Mr. Snyder, the Defamatory Articles and/or any actual or anticipated negative publicity concerning Mr. Snyder" (the "Moag Subpoena").

40. In response to the Moag Subpoena – and only following protracted discovery disputes and motion practice – Moag & Co. produced heavily redacted copies of Mr. Moag's Verizon phone records associated with his cell phone number ending in -9992.

41. Petitioner moved to compel the production of unredacted copies of these phone records, and the District of Maryland granted Petitioner's request, holding that Moag & Co. had

- 10 -

waived any objections – including the right to withhold in whole or in part responsive documents such as the Verizon phone records. Murphy Decl., Ex. C.

42. However, to date Moag & Co. has refused to comply with the District of Maryland's order compelling the production of unredacted copies of Mr. Moag's cell phone bills during the relevant time period.

### VII. DISCOVERY REQUESTED

43. Upon information and belief, Respondent is in possession, custody, and/or control of documents and information that will demonstrate Mr. Moag's – and by extension, Moag & Co.'s — connections to MEAWW, other third parties hostile to Petitioner, and the coordination between each of the foregoing to disparage and defame Petitioner, all of which is currently at issue in the Indian Action. Accordingly, Respondent possesses documents and information that bear directly upon the issues in the Indian Action and which Petitioner would be unable to obtain through discovery in the Indian Action.

44. As set forth in further detail in the annexed subpoena, Petitioner seeks copies of phone logs, invoices, text messages, and other documents associated with Mr. Moag's account for the time period of January 1, 2020 – present.

### VIII. PETITIONER IS ENTITLED TO THE DISCOVERY SOUGHT HEREBY

#### A. Section 1782 Governs this Court's Authority to Order Discovery

45. 28 U.S.C. § 1782(a) provides, in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

- 11 -

46. Since 1948, "Congress [has] substantially broadened the scope of assistance federal courts could provide for foreign proceedings," pursuant to § 1782. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256-57 (2004).

47. Indeed, courts in this Circuit have repeatedly recognized the liberal policy in favor of granting petitions for judicial assistance under § 1782. *See In re Chevron Corp.*, 633 F.3d 153, 162 (3d Cir. 2011) (affirming grant of § 1782 application and noting that relevant evidence sought pursuant to § 1782 is presumptively discoverable). A district court should consider a Section 1782 request in the light of the statute's aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts. *See Intel Corp.*, 542 U.S. at 252; *In re O'Keeffe*, 646 F. App'x 263, 267 (3d Cir. 2016).

B.    **Petitioner Satisfies the Requirements under Section 1782**

48. A district court has authority to grant an application for judicial assistance pursuant to Section 1782 if the following requirements are met: "(1) the person from whom discovery is sought resides or is found in the [District of New Jersey]; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or 'any interested person.'" *See In re Mesa Power Grp., LLC,* No. 2:11-MC-270-ES, 2013 WL 1890222, at *3 (D.N.J. Apr. 19, 2013) (quoting *In re Bayer AG*, 146 F.3d 188, 193 (3d Cir. 1998)). Each of these prerequisites for this Court to order discovery in aid of the Indian Action is satisfied.

49. *First*, Verizon resides in this District, as its principal place of business is located in Basking Ridge, New Jersey.

50. *Second*, this request seeks the production of documents from Respondent in support of the Indian Action. A true and correct copy of the pleadings filed in the Indian Action is attached to the Murphy Decl. as **Exhibit D,** and copies of the proposed subpoena to be served on Respondent is annexed to the Murphy Decl. as **Exhibit B**. As set forth above, the discovery that Petitioner seeks is limited in nature and intended to further establish the liability of the defendants in the Indian Action by elucidating their bad faith and active participation in a broader scheme to defame Petitioner, as well as identifying those individuals and entities who perpetuated the corrupt disinformation campaign.

51. *Third*, Petitioner is an "interested person" within the meaning of 28 U.S.C. § 1782. An interested person is one who has significant "participation rights" in the foreign action. *Intel*, 542 U.S. at 256-57. As the Supreme Court noted in *Intel*, "litigants are included among, and may be the most common example, of the 'interested person[s]' who may invoke § 1782." *Id*. at 256. Petitioner is the plaintiff in the Indian Action, and therefore is an "interested person" for the purposes of § 1782.

52. Accordingly, Petitioner's request satisfies the elements necessary to permit discovery pursuant to 28 U.S.C. § 1782, as recognized in this Circuit.

    **C.    The Court Should Exercise its Discretion to Grant Petitioner the Discovery He Seeks**

53. Once the statutory requirements of 28 U.S.C. § 1782 are met, the district court is free to grant discovery in its discretion. *See In re O'Keeffe,* No. 14-5835 WJM, 2015 WL 540238, at \*2 (D.N.J. Feb. 10, 2015). The Supreme Court has identified a number of factors for courts to consider when ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the foreign proceeding, and the receptivity of the foreign court to federal-court assistance; (3)

whether the application conceals an attempt to circumvent foreign proof-gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *See Intel*, 542 U.S. at 264-65; *Chevron*, 633 F.3d at 161-62. Here, all of these factors weigh in favor of granting the application.

54. *First*, where, as here, discovery is sought from a party that is not participating in the foreign proceeding, the need for court-ordered discovery is apparent. As the Supreme Court explained: "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782 aid." *Intel*, 542 U.S. at 264 (internal citations omitted). Respondent is not a party to the Indian Action and, upon information and belief, has no legal presence in India. Thus, the Indian Court has no jurisdiction to acquire the documents and testimony that Petitioner seeks here and which are critical to Petitioner's ability to prove his claims in the Indian Action.

55. *Second*, courts must look at the nature of the foreign proceeding and the receptivity of the foreign tribunal to federal court assistance. Here, there is no evidence that the discovery sought in this application would "offend" the Indian Court. To the contrary, the discovery sought would relate to the lack of truth in the Defamatory Articles and shed light on the authors' motivations in posting the Defamatory Articles, goals which are directly relevant to the Indian Action.

56. ***Third***, this application is not an attempt to circumvent any foreign proof-gathering restrictions and does not violate any Indian restrictions on gathering evidence.[2]  Petitioner has a good-faith basis for believing that he will be able to use these materials in the Indian Action. Petitioner has no reason to believe that the Indian Court would not be receptive to the judicial assistance requested, nor is Petitioner aware of any limitation on discovery imposed by the Indian Court, either generally or specifically, such that the request would "circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Id.* at 264-65. The Court's grant of judicial assistance would permit Petitioner to appropriately prosecute his claim against Eleven, along with the authors of the Defamatory Articles and Eleven's relevant principals and affiliates, in India given that Respondent is in exclusive possession of information highly relevant to Petitioner's claim.

57. ***Fourth***, the document requests in the proposed subpoenas are neither unduly burdensome nor intrusive.  Petitioner has tailored his narrow requests to seek only those materials relevant to the Indian Action, and the documents requested lend themselves to easy identification and production.  Additionally, upon information and belief, the requested documents are maintained in the ordinary course of business for Respondent.

## IX. CONCLUSION

58. For the reasons set forth herein, Petitioner respectfully requests that the Court issue an Order, pursuant to 28 U.S.C. § 1782, granting Petitioner leave to serve Verizon with the subpoena appended to the Murphy Decl. as Exhibit B.

---

[2] As the Supreme Court noted in *Intel*, the Court's analysis of a Section 1782 application does not extend to the discoverability or admissibility of the information in the foreign forum. *See Intel*, 542 U.S. at 260 ("Beyond shielding material safeguarded by an applicable privilege, however, nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there.").

Dated: January 15, 2021

        REED SMITH LLP

        By: */s/ David Murphy*
            David Murphy, Esq.
            506 Carnegie Center, Suite 300
            Princeton, NJ, 08540
            dmurphy@reedsmith.com

            Jordan W. Siev
            *(Pro Hac Vice Motion Forthcoming)*
            599 Lexington Avenue, 22nd Floor
            New York, NY 10022
            Tel: (212) 521-5400
            jsiev@reedsmith.com

            *Attorneys for Petitioner*
              *Daniel Snyder*