# EXHIBIT A

To Respondent Moag & Co.'s Motion for Leave to File Surreply

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE APPLICATION OF DANIEL SNYDER for an Order Directing Discovery from Moag & Co., LLC Pursuant to 28 U.S.C. § 1782 | Case No. 20-CV-02705-ELH |

**RESPONDENT MOAG & CO., LLC PROPOSED SURREPLY
IN OPPOSITION TO PETITIONER'S
APPLICATION FOR ORDER TO SHOW CAUSE AND OTHER RELIEF**

Petitioner Daniel Snyder raised two new issues in his Reply Memorandum (ECF 48) filed in support of his Application for Order to Show Cause and Other Relief (ECF 35). Respondent Moag & Co., LLC hereby responds solely to those two issues.

**I.     ARGUMENT**

**A.     Petitioner Willfully Misconstrues Mr. Moag's Text to Greg Owens.**

Petitioner accuses Mr. Moag of trying to "extort[]" him into dropping this action by sending a text message to Greg Owens. Petitioner describes Mr. Owens as his "business representative," which is roughly how Mr. Moag understood the relationship between Mr. Snyder and Mr. Owens when Mr. Snyder through his counsel urged Mr. Moag to include Mr. Owens in certain communications. To understand Mr. Moag's text, the Court should be aware of the preceding communications between Mr. Moag and Mr. Snyder, and separately between Mr. Moag and Mr. Owens.

In late May through July 2020, Mr. Moag and Mr. Snyder had text and other communications about the business transaction that Mr. Moag was trying to close on behalf of his clients, the three minority shareholders of the Washington Football Team who were trying to sell their interests to a third party. *See* Ex. 1, at MOAG000015-16. The conversations and texts were cordial until two events in August and September. First, in early August two intruders showed up

at Mr. Moag's house asking questions about Mr. Snyder. *Id.* at MOAG000017. Mr. Moag believed then and still believes that these private investigators were sent unannounced by or on behalf of Mr. Snyder. Second, in mid-September, Mr. Snyder filed this Petition *ex parte* and Mr. Moag learned about it from the press.

On September 17, after hearing about the Petition that falsely accuses Mr. Moag of misconduct, Mr. Moag sent the following text to Mr. Snyder:

> Hey Dan—My lawyers sent me your filing in which you are representing yourself Pro Se. I'd be glad to represent myself Pro Se but only private discussions with you as well. That requires a business deal, not a legal process. If you continue your game, you know what I know and what I have never spoken about. And you know it has nothing to do about the media shit….it's the more serious shit.
>
> If you want to get to a clean conclusion, let me know. If you want a shit show, we are on for that too.

*Id*. at MOAG000017-18. Mr. Snyder responded, "Please call me," *id.*, and the subsequent call was recounted in Mr. Moag's Declaration. ECF 31-1, at 11 ¶ 16. Mr. Moag told Mr. Snyder (and later told Mr. Owens) that "while I didn't believe and cared nothing about the scandalous India Lawsuit allegations, I had for many months known about serious corporate malfeasance issues that neither I nor my clients have disseminated, and weren't then in the press. I warned and they seemed to agree that discovery relating to me, if not limited to the Indian litigation, could harm both Snyder and my clients." *Id*.

Subsequently, in text messages between Mr. Moag and Mr. Owens beginning in October 2020, Mr. Moag stated that he was "[f]ollowing up on a meeting with the buyers and Dan [Snyder]. I don't know what your role is facilitating this." Ex. 2, at MOAG000130. Mr. Owens responded: "More of an advisor, which I'm encouraging him to meet with potential buyers to take out the minority shareholders." *Id.* In subsequent text messages Mr. Moag encouraged Mr. Owens to urge

2

Mr. Snyder to meet with prospective buyers of the minority interests in the Washington Football Team. *Id.* at MOAG000130-32. Mr. Snyder resisted unless the minority shareholders waived rights to make claims of tortious interference against Mr. Snyder for participating in the meeting. Although Mr. Moag (and apparently Mr. Owens) pressed for the meeting to occur, Mr. Snyder never fully agreed. *See id.*

Mr. Moag and Mr. Owens had intermittent text communications through November and December 2020. Ex. 2, at MOAG000132-33. Both expressed some exasperation with Mr. Snyder. *See id.* at MOAG000133-34. In late December, Mr. Moag, still trying to help his clients sell their interests to a third-party buyer, asked if Mr. Owen was "still talking to DS." Mr. Owens replied, "Some, not as much, he knows my thoughts." Mr. Moag asked for a telephone conference with Mr. Owens, stating that Mr. Snyder "seriously needs some type of closure to all of this. As does everybody." Ex. 3 (photo of text message string from Mr. Moag's device); *compare* Ex. 4 (exhibit with dated texts, as filed by Mr. Snyder's counsel in Case No. 20-cv-03290).

On January 7, 2021, Judge Messitte held a hearing in the case pending between the minority shareholders and Mr. Snyder. Although neither Respondent nor Mr. Moag is a party to that matter, Mr. Moag appeared in response to Judge Messitte's order. The hearing involved the Court's attempt to determine whether any of the principals leaked confidential case information to the press. Mr. Moag answered the Court's questions, as did Mr. Snyder, the three minority shareholders, and the lawyers for the parties.

After the hearing, Mr. Moag sent Mr. Owens the text quoted in Petitioner's Reply, which Mr. Snyder characterizes as extortionate. It is nothing of the sort. Mr. Moag was reporting to Mr. Owens, with whom he had been corresponding for months at Mr. Snyder's direction, that he had been asked about their "shit show" conversations and that he had answered honestly. "Namely,"

Mr. Moag explained, "the show that happened yesterday and will happen again and probably uglier when this Pandora's box is unwrapped by more litigation and discovery. We've talked about that." ECF 48, at 3.

What they had talked about, of course, was Mr. Moag's explanation that he knew *nothing* about the "scandalous India Lawsuit allegations," ECF 31-1 at 11, ¶ 16, although he did know about corporate malfeasance issues but had never spoken about them publicly. Mr. Moag closed with yet another request to avoid wasteful and imprudent litigation: "If you are brought back under the tent, maybe you can help a return to the basics of a business deal."

Mr. Moag was hardly "threatening to disclose unspecified negative information about Petitioner in an attempt to extort him into dropping the instant Section 1782 proceeding, among other litigation in which Mr. Snyder is involved." ECF 48, at 3. On the contrary, he was reminding Mr. Owens about his previous requests that Mr. Snyder should stop pursuing baseless litigation that would inevitably require Mr. Moag to disclose what he knows about WFT corporate malfeasance – the "shit show" that Mr. Moag inelegantly described in September. (Mr. Moag apologized to Judge Messitte for his language.) As his plea to "return to the basics of a business deal" indicated, Mr. Moag *did not want to publicize that information*. It would not be good for Mr. Moag's clients or for Mr. Snyder. Mr. Moag's text is not "extortion"; it is a plea for business sanity.

> **B.      Mr. Snyder is not Entitled to a Gag Order.**

Relying on the same two texts discussed above, Mr. Snyder now seeks an order prohibiting Respondent and its agents from speaking to the press. (Ironically, Mr. Snyder also relies on Mr. Moag's *refusal* to tell a Washington Post reporter about the malfeasance issues. *See* ECF 48, at 12.) As set forth above, those texts provide no legitimate fear that Mr. Moag will disparage Mr. Snyder in the press. Even if they did, the First Amendment would prohibit Mr. Snyder's requested gag order.

"Even among First Amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions." *In re Murphy-Brown LLC*, 907 F.3d 788, 796-97 (4th Cir. 2018). The proponent of a gag order must establish a compelling public interest warranting a prior restraint on speech. *Id.* Petitioner here has not even tried to articulate a compelling interest. His lead authority, *Nebraska Press Ass'n* v. *Stuart*, 427 U.S. 539 (1976), *reversed* a gag order. The proffered compelling interest in that case was the usual one: improper pretrial publicity, which can influence prospective jurors. In that context the Court observed that trial courts in appropriate cases might limit what lawyers, police, and witnesses could say. *See id.* at 564. This case, by contrast, is an ancillary petition seeking discovery ostensibly related to a proceeding in India, with no possibility of a jury trial. Pretrial publicity is not an issue.

Mr. Snyder also cites Judge Messitte's order that the parties in *Rothman* v. *Snyder* "file under seal any papers that might have disparaging information about other parties," as Mr. Snyder describes the order. *See* ECF 48, at 13. But Judge Messitte rescinded the portion of that order requiring that "disparaging" papers be filed under seal after the Washington Post pointed to clear appellate authority holding that reputational interests were insufficient to overcome the public's First Amendment and common law rights of access to the courts. *Rothman* v. *Snyder*, Case No. 8:20-cv-03290-PJM, ECF 107, at 2 (citing *Doe* v. *Public Citizen*, 749 F.3d 246, 269-70 (4th Cir. 2014)).[1]

---

[1] Judge Messitte left in force that aspect of his order that directed the parties not to take actions to interfere with (by way of disparagement or otherwise) the rights of the minority shareholders to negotiate with third parties for the purchase of their shares or the right of Mr. Snyder to assert a contractual entitlement to a right of first refusal with respect to such a proposed purchase. Mr. Moag, of course, has every incentive to ensure that a purchase takes place because his fees as an investment advisor will be paid when the minority owners' shares are sold, whether to third parties or to Mr. Snyder.

Mr. Moag and his company are not the Petitioners here. They did not file this action. They are not parties to the case pending before Judge Messitte. They are not defendants in the Indian defamation action filed by Mr. Snyder, and they have no knowledge concerning the sources for those scandalous allegations. Mr. Snyder has a pattern of filing lawsuits and then asking the courts to seal his opponents' filings and muzzle their speech. But the key to his deliverance from litigation publicity is not held by the courts. It is in his own pocket. The request for a gag order is without merit and should be denied.

## II. CONCLUSION

For the reasons stated herein and in his initial opposition, Respondent Moag & Co., LLC respectfully requests that the application for an order to show cause be denied.

Respectfully submitted,

ZUCKERMAN SPAEDER LLP

By:  /s/ *William J. Murphy*
———————————————

William J. Murphy (#00497)
John J. Connolly (#09537)
100 E. Pratt St., Suite 2440
Baltimore, Maryland 21202
(410) 332-0444
(410) 659-0436 (fax)
wmurphy@zuckerman.com
jconnolly@zuckerman.com

*Attorneys for Respondent*

Joe R. Reeder (#06701)
Stephen T. Fowler (#16881)
GREENBERG TRAURIG, LLP
2101 L Street N.W.
Washington, DC 20037
(202) 331-3100
reederj@gtlaw.com
fowlerst@gtlaw.com

*Attorneys for Respondent*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of January, 2021, a copy of the foregoing was electronically filed and served on all counsel of record via ECF or by e-mail if filed under seal.

/s/ *John J. Connolly*
-------------------------

7614386.2