# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE APPLICATION OF DANIEL SNYDER for an Order Directing Discovery from Moag & Co., LLC Pursuant to 28 U.S.C. § 1782 | Case No. 20-CV-02705-ELH |

## RESPONDENT'S OPPOSITION TO PETITIONER'S APPLICATION FOR SANCTIONS and MEMORANDUM IN SUPPORT OF CONDITIONAL CROSS-MOTION FOR LEAVE TO TAKE DISCOVERY FROM PETITIONER

William J. Murphy (#00497)
John J. Connolly (#09537)
ZUCKERMAN SPAEDER LLP
100 E. Pratt St., Suite 2440
Baltimore, Maryland 21202
(410) 332-0444
(410) 659-0436 (fax)
wmurphy@zuckerman.com
jconnolly@zuckerman.com

*Attorneys for Respondent*

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 2

II.  MATERIAL FACTS ....................................................................................... 4

   A.   Moag & Co. annoys Mr. Snyder by successfully representing the minority
        owners of WFI. ......................................................................................... 4

   B.   Media reports about sexual misconduct at the WFT ...................................... 5

   C.   Mr. Snyder sends private investigators to confront perceived sources for media
        reports. .................................................................................................... 6

   D.   Mr. Snyder files his § 1782 Petition against Moag & Co. and immediately sends
        it to the press. ........................................................................................... 8

   E.   Mr. Snyder files § 1782 Petitions against other perceived sources for negative
        media reports about him or the WFT. .......................................................... 8

   F.   Respondent's extensive efforts to produce responsive information to Petitioner. ......... 12

   G.   Mr. Snyder misleads the India court and the U.S. media about material obtained
        in this action. .......................................................................................... 17

III. ARGUMENT ................................................................................................ 18

   A.   Respondent did not spoliate evidence. ........................................................ 18

        1.   Petitioner has not identified any "evidence" that Respondent had an
             obligation to preserve, much less evidence that a reasonable factfinder could
             conclude supported Respondent's claims ............................................... 19

        2.   Respondent did not destroy any document with a "culpable state of mind." ......... 20

   B.   Petitioner waived the relief requested by the motion for sanctions ................ 22

   C.   If the Court is at all inclined to grant Petitioner's motion, the Court should first
        give Respondent leave to serve document requests and a notice of deposition to
        determine if Petitioner is improperly using the courts to harass Respondent and
        generate favorable publicity for himself ..................................................... 23

IV.  CONCLUSION ............................................................................................. 26

i

Respondent Moag & Co., LLC opposes Petitioner Daniel Snyder's Application for Sanctions. (ECF 59). Petitioner's grossly misleading application falsely states that Respondent "**deliberately** and **knowingly** destroyed crucial documents and grievously injured Petitioner's ability to prosecute his defamation claims" in New Delhi, India. ECF 59-1, at 1. But Petitioner fails to identify a single responsive document that Respondent "destroyed"; his argument is that a few documents that Respondent *did* produce in photographic form did not appear in electronic form months later, when Respondent voluntarily produced his personal devices to a discovery vendor so Petitioner could search, again, for a connection between Respondent and the India litigation – a connection that never existed. The electronic version of those few "lost" texts may have been deleted before the subpoena was served; Petitioner did not knowingly delete anything that was responsive to the subpoena after it was served. In any event, as Petitioner well knows, a Magistrate Judge in Colorado recently concluded that another recipient of a Snyder § 1782 petition substantially complied by producing screen shots of text messages, which is precisely what Respondent did here. *See* Ex. 1. But Mr. Snyder is far more interested in the publicity generated by his outlandish court filings than in any relief the courts could award – publicity that has severely damaged Respondent.

For the reasons set forth below, Petitioner's application should be denied, and the Court should admonish Mr. Snyder to cease his continuing abuse of the court system to harass third-party non-witnesses like Moag & Co. Alternatively, because Respondent reasonably believes that Petitioner is abusing the one-sided § 1782 proceedings to bolster his media profile and to damage Respondent (as well as Petitioner's other perceived enemies), this Court should grant Respondent

leave to serve discovery requests aimed at determining whether Petitioner has pursued this action in good faith or for an improper purpose within the meaning of Rules 11, 26(g), and 45.

## I.   <u>INTRODUCTION</u>

This case arises from a tactical defamation action Mr. Snyder filed in New Delhi, India against an obscure Indian website. *See* ECF 1 ¶¶ 1-3. The website re-published anonymous Internet rumors that Mr. Snyder appeared on Jeffrey Epstein's "list"—rumors that that were unsourced and facially unbelievable. *Id.* ¶ 2. Moreover, the principal of Moag & Co., John Moag, has declared under oath that he does not believe the rumors and had no role in their publication in India. ECF 31-1 ¶ 5. Mr. Snyder is routinely impugned in U.S. media and Internet publications, including in major news sources like the *Washington Post*, to say nothing of the comment sections to those articles and on websites frequented by fans of the Washington Football Team ("WFT"), which savage Mr. Snyder on a daily basis. *See*, *e.g.*, Will Hobson and Liz Clarke, *From dream job to nightmare*, Wash. Post (July 16, 2020) (2800 comments, many adverse to Mr. Snyder during two-week discussion period). Some of the legitimate news stories about him or his business raise allegations of sexual misconduct, *see id.*, but Mr. Snyder has not sued any U.S. media source for publishing those stories. In the India publications, however, Mr. Snyder found a weak, foreign opponent that actually published a *false* rumor about him. Although the Indian website removed the offending articles on Mr. Snyder's demand, ECF 1 ¶ 25, their publication gave him an opportunity to file numerous petitions in U.S. federal courts seeking intrusive discovery from third parties, under the (usually) one-way discovery vehicle of 28 U.S.C. § 1782. Petitioner's ostensible purpose is to find out who "planted" the outlandish stories in India, but Respondent reasonably believes Petitioner's true purpose is to harass his perceived enemies who have no countervailing right of discovery, and to generate a public narrative that Petitioner was falsely accused of sexual misconduct and has aggressively defended his reputation. *See* ECF 31-1 ¶ 4.

Two of those discovery petitions were filed against Moag & Co., including the one at issue here. Although Moag & Co. knew it would have no evidence relevant to Mr. Snyder's India action, *see* ECF 31-1 ¶ 4, it nevertheless made extraordinary efforts to comply with Mr. Snyder's discovery demands, *see* ECF 31-1 at Ex. A (Affidavit of Nate Wilson), & Ex. B (Declaration of Joe Reeder), including most recently by voluntarily submitting Mr. Moag's *personal* iPhone and iPad to a third-party discovery vendor and by voluntarily submitting to an interview with Mr. Snyder's lawyers – who promised to dismiss this action and issue a release if Mr. Snyder liked Mr. Moag's answers. *See* Exs. 2, 3. It is perhaps telling that Mr. Snyder makes no mention of these facts in the pending Motion for Sanctions. When Mr. Snyder did not like Mr. Moag's answers during the interview, he filed this motion, and also spitefully refused to waive a confidentiality clause that would permit Moag & Co. to assess what fee it was owed from its clients, the former minority owners of Washington Football Inc. (WFI), who received a substantial return on their investments after Moag & Co.'s efforts led to Mr. Snyder's purchase of the clients' interests. *See* Ex. 4.

It has become obvious that Mr. Snyder will never be satisfied with Respondent's discovery responses because he is not really interested in the discovery. He's interested in the media coverage he can generate from the inflammatory accusations he makes in court filings, and the damage that coverage can inflict on persons he dislikes. The most recent example is the instant motion, which was served on undersigned counsel by ECF at 10:04 p.m. on April 22, 2021. *Seven minutes later,* a reporter for online sports journal *The Athletic* sent Mr. Moag a copy of the docket entry for the motion and asked if he had "a comment on this filing, which alleges you deleted electronic correspondences in violation of court orders and seeks sanctions." Ex. 5, at 1. About an hour later, *The Athletic* posted a detailed story about Mr. Snyder's filing. The article explained that "Snyder's

3

latest motion does not specify how much the court should fine Moag but argued it should be comparable to" a 2011 case in which a magistrate judge ordered a corporate executive "imprisoned for two years" and, after that punishment was reversed, fined over $1 million. Ex. 6, at 3. Stories followed the next day in *Yahoo! News* and *Sports Illustrated*. A sports radio show in Washington D.C. aired on the morning of April 23 accused Mr. Moag of actually manufacturing and spreading the rumors that resulted in the India story – an accusation that even Mr. Snyder does not have the temerity to make. *See The Kevin Sheehan Show – Hour 3*, Apr. 23, 2021, Segment 7 at 08:50 (interview with lawyer "Neil in Rockville") (available at https://omny.fm/shows/the-kevin-sheehan-show/4-23-21-the-kevin-sheehan-show-hour-3).

Mr. Snyder knows that Moag & Co. has no information relevant to his India defamation action. He also knows that Moag & Co.'s business depends on Mr. Moag's reputation among sports executives and investors. He knows that by filing baseless allegations and then furnishing them to the press he can damage Moag & Co.'s business, as indeed he has. He will not stop this harassment unless a court rebukes him. For the reasons set forth below, this Court should do so.

## II.  MATERIAL FACTS

### A.  Moag & Co. annoys Mr. Snyder by successfully representing the minority owners of WFI.

Moag & Co. is a four-employee Baltimore-based firm that represents buyers and sellers of professional sports teams. ECF 31-1 ¶ 1. John A. Moag Jr. is Moag & Co.'s principal. Petitioner Daniel Snyder is the owner of Washington Football, Inc. (WFI), which owns the WFT, formerly known as the Washington Redskins. Mr. Snyder is widely reviled by his team's fan base, among many others in the world of professional football. *See*, *e.g.*, Claire McNear, *Dan's Disaster: How the Washington Redskins Plummeted to Rock Bottom*, The Ringer (Dec. 24, 2019). After enduring years of horrible publicity arising from Mr. Snyder's mismanagement of the team, WFI's three

minority owners retained Moag & Co. to sell their combined 40 percent interests in WFI. ECF 31-1 ¶¶ 6-7. Moag & Co. spent thousands of hours of employee time on the transaction over the course of several years. Ultimately it procured a qualified buyer who presented an offer that was acceptable to the minority owners. But Mr. Snyder obstructed the transaction, which led to separate litigation in this Court between the minority owners and Mr. Snyder. *See Rothman* v. *Snyder*, Case No. 8:20-cv-03290-PJM. Moag & Co. was not a party to that litigation and was barred from receiving information about it. Ultimately the parties and the NFL reached a deal through which Mr. Snyder would purchase the minority interests for $875 million, according to published reports. Moag & Co. is entitled to a fee from that sale, but the parties have subjected the transaction to confidentiality agreements and thus far have excluded Moag & Co. from access to the transaction documents. Mr. Snyder, through his counsel in this case, recently refused to permit Moag & Co. access to the transaction documents, even though Moag & Co. was willing to be bound by a non-disclosure agreement. *See* Ex. 4.

### B.    Media reports about sexual misconduct at the WFT

In July 2020 reports began surfacing that the *Washington Post* was about to publish a major exposé about sexual misconduct among employees and executives of the WFT. Speculation about the story became a story itself. *See* Paul Farhi, *Everyone knew there was a Redskins story – but what was it? That's when the rumors took over*, Wash. Post (July 16, 2020). Many legitimate journalists predicted a bombshell story, and as usual many Internet commenters provided raw speculation about its content.

On July 16, 2020, the Indian website known as MEA WorldWide, or MEAWW, published two stories that essentially reprinted Internet speculation about what the *Post* article would cover. One of MEAWW's articles, citing a Reddit page, stated that "other users on the internet wondered if the article would be about his alleged involvement in sex trafficking." It quoted a "user"

comment that Mr. Snyder "was on Epstein's list too." ECF 1-8, at 111. A subscription to the article stated that MEAWW "cannot independently verify the claims or accusations being made on the Internet." *Id.* The second article quoted anonymous tweets, including one "joke" stating that "Dan Snyder has decided on a new team name: Epsteins." *Id.* at 113.

The first *Post* article was also published on July 16, 2020. *See* Hobson & Clarke, *supra*. That article, and others to follow, did *not* accuse Mr. Snyder of sex trafficking or link him to Jeffrey Epstein in any way. Nor did the articles directly accuse Mr. Snyder of sexual misconduct. But they set forth a shocking series of sexual-misconduct allegations involving the team's cheerleaders, among others, occurring for years in the WFT workplace headed by Mr. Snyder. The articles cited dozens of former team employees, some named and some unnamed. *See id*. The team responded to the *Post*'s articles by retaining lawyer Beth Wilkinson and her firm Wilkinson Walsh to investigate the misconduct. (Ms. Wilkinson's report still has not been made public, and Mr. Snyder and the WFT is now litigating against her, too. *See* Rachel Scharf, *DC NFL Team Accuses Wilkinson's Atty of Threatening Leaks*, Law360 (Apr. 23, 2021).) Mr. Snyder responded by filing a lawsuit – not against the *Post* in a U.S. federal court or against any named source for the *Post*'s stories, but against MEAWW in the High Court of Delhi at New Delhi, India. *See* ECF 1.

### C.   Mr. Snyder sends private investigators to confront perceived sources for media reports.

After the MEAWW and *Post* articles appeared, as Moag & Co. was working on the sale of WFI's minority interests, two strangers appeared at Mr. Moag's residence in suburban Baltimore. ECF 31-1 ¶¶ 11. This was at 8:30 a.m. on Saturday, August 1, 2020. The strangers wore no masks (in the height of the pandemic) as they flanked Mr. Moag and moved in tandem with him. *Id.* They refused to identify themselves or who they worked for, stating only that they represented "a client interested in the Redskins and we'd like to know what you are saying about the Redskins and the

owner, and what you think of the media about him on the internet." *Id.* Mr. Moag later learned that

at least two other Snyder "enemies" and direct or indirect targets of his § 1782 petitions, Mary

Ellen Blair and Marc Randazza, received similar visits. *See id.* (Blair); Ex. 7 (Declaration of Marc

J. Randazza in separate § 1782 action), at ¶¶ 24-25. Respondent is confident that Mr. Snyder was

behind these intimidation efforts; indeed, his lawyers in this case have all but admitted it, albeit

not in this case. The *Washington Post* has reported that *eight* people "said they were approached

by private investigators, either at their homes or via phone calls, seeking information about

Snyder's former executive assistant [Ms. Blair], the team's workplace or both." Ex. 8, at 1

(*Washington Post* article dated Sep. 4, 2020). Further, after Ms. Blair's attorney informed the court

that "the NFL has told Mr. Snyder to back off" on his use of private investigators, Mr. Snyder's

counsel responded as follows (according to the Washington Post):

> [Ms. Blair's counsel's] comment drew an immediate rebuke by Snyder's attorney, Joe Tacopina. "Nothing could be further from the truth," he said at the hearing. In a statement to The Post, Tacopina denied the claim that the NFL told Snyder to "back off" and said that *the private investigator activity relates to Snyder's defamation suit against an India-based website, Media, Entertainment, Arts, WorldWide*, not the NFL-backed probe into the team's treatment of women being led by attorney Beth Wilkinson.
>
> "Dan Snyder has specifically instructed his legal team not to interview any claimed victim of sexual harassment allegations," Tacopina said. "But he will continue his quest to uncover who was behind the despicable and false stories printed about him."

*Id.* (emphasis added).  Notwithstanding this admission by Mr. Tacopina, who is counsel of record

for Mr. Snyder in this action, Mr. Snyder's attorneys have asserted in this Court that Mr. Moag's

description of his unwanted visit by these investigators, and that they had been engaged by Mr.

Snyder, was fabricated. *See* ECF 35-1, at 8.

**D.    Mr. Snyder files his § 1782 Petition against Moag & Co. and immediately sends it to the press.**

In August 2020, Mr. Snyder filed his defamation action in India against the entities that published the sexual-misconduct allegations. ECF 1, at ¶ 1. He then filed a series of petitions in federal courts under 28 U.S.C. § 1782. The petition in this case is dated September 15, 2020, ECF 1 at 14, but a declaration filed with the Petition is dated September 16, 2020, ECF 1-3, at 2, and the Petition bears a Clerk's office ink stamp dated September 17, 2020, and an electronic header dated September 18, 2020. ECF 1, at 1. Although the Petition was filed *ex parte* and appears to be sealed, it bears no ledger stating that it is sealed or confidential. *See* ECF Policies and Procedures Manual § III.B.5.a. For reasons that are not clear, neither the Petition nor a docket entry for the Petition appears on the docket in this case. Thus, the media, even now, cannot obtain the Petition from the ECF system.

Yet on September 15, 2020, two days *before* the Petition was ink-stamped as received by the Clerk, *Front Office Sports* reported that "Moag & Company and website design company Precision were the focus of petitions filed in federal district courts on Sept. 15." ECF 31-1, at ¶ 3; *see* Ex. 9, at 2-3 (*Front Office Sports* article). The article identified the Moag & Co. Petition as a filing under "Section 1782" and quoted at least one specific clause from the Petition. *See* Ex. 9, at 4; *compare* ECF 1, at ¶ 31. Mr. Moag knew nothing about the Petition until the reporter contacted him that same day, after his story was posted. Mr. Moag would not even *see* the Petition until months later on November 24, 2020, when Petitioner's counsel finally agreed to furnish it to Respondent's counsel. *See* ECF 31-1 at ¶¶ 3-4.

**E.    Mr. Snyder files § 1782 Petitions against other perceived sources for negative media reports about him or the WFT.**

Mr. Snyder has leveraged his strategic India case into numerous § 1782 (or related) petitions filed against perceived enemies other than Mr. Moag, including the following:

*Mary Ellen Blair* (No. 20-mc-00023, E.D. Va.). Ms. Blair was a former executive assistant for WFT who apparently left her employment on bad terms. Mr. Snyder claimed that she was a source for the MEAWW stories and filed a § 1782 Petition against her in the Eastern District of Virginia. Ms. Blair denied that she had any knowledge of the MEAWW stories and argued that Mr. Snyder was retaliating against her for allegedly speaking with the *Washington Post*. Ex. 10, at 1-2. Mr. Snyder has repeatedly accused Mr. Moag of conspiring with Ms. Blair to plant the MEAWW stories, relying on an alleged telephone call between them on July 7, 2020 – a telephone call that never took place. *E.g.*, ECF 35-1, at 8. Indeed, in this case Mr. Snyder has accused Mr. Moag of lying under oath about whether he had "telephonic contact with Ms. Mary Ellen Blair on July 7, 2020." *See* ECF 35-1, at 8. Mr. Moag has explained repeatedly that he had no communications with Ms. Blair until August 2020, long after the MEAWW articles were published, a fact confirmed by Ms. Blair's counsel. *See, e.g.*, ECF 31-2, ¶ 6; ECF 42, at 12. This fact also was later effectively confirmed in a declaration from Ms. Blair that Mr. Snyder himself filed in the India action. *See* Ex. 13. Yet Mr. Snyder has never retracted his false allegation about Mr. Moag's nonexistent July 7 telephone call with Ms. Blair, and he has suffered no consequences for making it.

*Jessica McCloughan*. (No. 20-mc-00199 D. Colo.). Ms. McCloughan is the wife of Scot McCloughlan, who formerly served as general manager of the WFT. In his § 1782 petition, Mr. Snyder claimed that Ms. McCloughan communicated with a person close to the minority owners of WFI "numerous times" at around the time when the India articles were published. *See* Ex. 1, at 2-3. In response to Mr. Snyder's subpoena *duces tecum*, Ms. McCloughan, like Moag & Co., produced text messages in the form of screen shots from her phone. *See* Ex. 1, at 6, 8. Mr. Snyder was dissatisfied and moved to compel. The Magistrate Judge concluded that Ms. McCloughan had

substantially complied, and that Mr. Snyder's "efforts to obtain extensive cell phone records and text[] messages from Mrs. McCloughan appears to [be] a fishing expedition, without significant factual justification." Ex. 1, at 9.[1] The Magistrate Judge also rejected Mr. Snyder's theory that talking to a reporter for the *Washington Post* in connection with the Post's damning article about other sexual misconduct at WFT was in some way relevant to the Indian publications. *See id.*

*Peter Schaffer*. (No. 20-mc-00191, D. Colo.). The Petition alleges that Mr. Schaffer is a lawyer and agent who represents professional athletes, including former members of the WFT. Ex. 12, at ¶ 4. Mr. Snyder suspects Mr. Schaffer had a role in the MEAWW publications because he "has a long history of representing parties adverse to the [WFT] … and using his publicly touted network of media connections in order to generate 'national exposure and premiere interview sound bites' on behalf of his clients." *Id.* Mr. Schaffer also successfully represented Ms. McCloughan in her opposition to the § 1782 petition filed against her.

*Bruce Allen*. (No. 2:21-mc-00022-SPL, Dist. Ariz.). Mr. Allen is the former president and general manager of the WFT. On April 15, 2021, two days after Mr. Snyder's counsel interviewed Mr. Moag and asked numerous questions about Mr. Allen, Mr. Snyder filed a § 1782 petition against Mr. Allen in California, which he later re-filed in the District of Arizona. *See* Ex. 13. Mr. Snyder alleges that Moag and Snyder "participated in . . . an astonishing 1,237 minutes (nearly 21 hours)" of calls between January 9, 2020, and November 18, 2020. Ex. 13, at 2. As Mr. Moag and his counsel have explained to Mr. Snyder's counsel repeatedly, however, there is nothing "astonishing" about this fact, as the two men were friends well before Mr. Allen worked for the WFT. Even though Mr. Snyder had been rebuked by a Magistrate Judge in Colorado for claiming

---

[1] The judge added that "it would be appropriate for [Ms. McCloughan's] counsel to personally inspect her cell phone for any additional or missed communications," Ex. 1, at 10, but "[t]here is no justification for requiring Mrs. McCloughan to produce phone records or text messages or e-mails with the Washington Post or its reporters." *Id.*

that contacts with the *Washington Post* were somehow relevant to the India action, he again alleged that Mr. Moag "spoke with members of the press, most notably *The Washington Post*," and that some of the Moag-Allen calls took place around the same time. *Id.* at 2.

*Shawn Ferguson* (No. 1:20-cv-03299, D. Md.). The papers for this case are under seal, for reasons that are not clear. Mr. Ferguson is currently a senior vice president for the Special Olympics. He previously worked as a senior assistant for the WFT from 2013 to 2015. Petitioner reported to Judge Messitte that he is seeking documents and deposition discovery pursuant to § 1782 "relating to Mr. Ferguson's connections to the defendants in the India action and alleged foreknowledge of negative media regarding Mr. Snyder." *Rothman* v. *Snyder*, D. Md. Case No. 8:20-cv-03290-PJM, ECF No. 91, at 6 (Dec. 29, 2020).

*Precision Creations LLC* (No. 4:20-mc-02665, S.D. Tex.). Precision Creations is a website designer that also denied any meaningful connection to MEAWW. *See* Ex. 14 (Affidavit of Precision Creations manager).

*New Content Media Inc.* (No. 20-mc-00076, C.D. Cal.). This Petition was directed at an entity that allegedly controls the MEAWW website, and thus seemingly would be one of the few legitimate targets of discovery for Mr. Snyder's India action. But here again Mr. Snyder overreached by making tenuous and allegedly false links between MEAWW and various individuals, including a lawyer named Marc Randazza. Mr. Randazza moved to intervene and to strike portions of the Petition, asserting that the allegations against him were false and retaliatory for a negative story he had written about Mr. Snyder. *See* Ex. 7, at ¶¶ 5-7; 28-31. The court denied the motion to intervene without prejudice but acknowledged that Mr. Randazza "may have a legitimate gripe about some of the statements and items that Mr. Snyder submitted with the

subpoena petition" and preserved Mr. Randazza's ability to challenge the subpoenas or seek an appropriate protective order. Ex. 15, at ¶¶ 11, 13.

*Moag & Co.* (No. 2:21-cv-00819, D.N.J.). Mr. Snyder filed a separate § 1782 petition in the District of New Jersey seeking additional telephone records from Verizon Communications Inc. for phone lines associated with Mr. Moag and Moag & Co.

**F.    Respondent's extensive efforts to produce responsive information to Petitioner.**

On September 29, 2020, this Court granted Petitioner's *ex parte* Application to serve two subpoenas on Respondent Moag & Co., one for documents and one for testimony. The documents subpoena applied to materials from "January 1, 2020 to present," and contained four requests:

> 1. All Documents and Communications concerning Mr. Snyder.
>
> 2. All Documents and Communications concerning MEAWW, Eleven and/or any affiliates, agents or employees thereof.
>
> 3. All Documents and Communications concerning the Defamatory Articles and/or any actual or anticipated negative publicity concerning Mr. Snyder.
>
> 4. All Documents and Communications between You and any third party concerning Mr. Snyder, the Defamatory Articles and/or any actual or anticipated negative publicity concerning Mr. Snyder.

ECF 59-3, at 10.

Respondent's prior counsel tried to work with Petitioner's counsel to narrow the scope of the subpoenas within reasonable limits in light of the § 1782 petition. Those discussions were productive in part, in the sense that counsel believed Respondent had narrowed the clearly overbroad Request No. 1 for "All Documents and Communications concerning Mr. Snyder." Nevertheless, in an abundance of caution, Respondent's counsel notified Petitioner's counsel on November 5, 2020, that he would "be timely filing objections on Monday, Nov. 9." Those objections stated in response to Request No. 1:

> In response to Defendant's objection to this overbroad Request, and subject to the agreed time window [defined in General Objections as "May 1-September 1, 2020], Parties have compromised, and Defendant will produce communications as described above. As is long known by Plaintiff and has been explained in some detail to the Snyder lawyers, the Company and Mr. Moag for years have represented minority owners of the Washington Football team, and therefore have had myriad occasions—for reasons wholly unrelated to the Indian litigation—to have exchanges that "concern" the majority owners. Parties have further agreed to production that is limited to anticipated or actual negative publicity, and not communications unrelated to that, which is highly proprietary in nature.

ECF 31, at 5; *see also* ECF 7-10 (Defendant's Responses and Objections to Requests for Production).

On November 9, 2020, in accordance with counsel's negotiations, Petitioner provided search terms for Respondent to run. ECF 12-2, at 140-41. A Moag & Co. employee, Nate Wilson, certified that he had complete access to the company's server and to Mr. Moag's computer and e-mail files. ECF 31-1, at ¶ 3. He obtained the services of an IT consultant to assist in the search, and together they ran the search terms provided by Mr. Snyder's counsel and produced all responsive e-mails, including e-mails stored in the cloud. *Id.* at ¶¶ 4-11. The company also produced phone records for company and office phones. ECF 30 ¶ 19.

Company servers and computers do not process text messages. Mr. Moag has a personal phone that he uses to send texts, mostly for personal purposes to family members and friends. As Respondent's prior counsel informed Mr. Snyder's counsel, and as Mr. Moag himself stated under oath, Mr. Moag "routinely delete[s] all text messages unless needed for business purposes." ECF 31-1 ¶ 12. Nevertheless, Mr. Moag ran the search terms on his phone and produced the few responsive documents that he still maintained. He later found a few additional texts when he turned on his personal iPad and saw that text messages had appeared on the device, even though he had never used it to send or to read text messages. *Id.* at ¶ 12. He immediately informed his prior

counsel and "was told to try to photograph the messages before the messages synced with iPhone deletions." *Id.* He followed those instructions and produced those photographed text messages to Petitioner.

Despite Respondent's repeated admonitions that Mr. Moag knew nothing about the India allegations before they were published and Mr. Moag's assurance that he disbelieved the India stories, *see* ECF 31-2, at ¶ 5, ECF 30, at ¶¶ 3, 5, Mr. Snyder took the position that Respondent must be hiding some damning text or e-mail, and he continually pressed for additional disclosures. Mr. Snyder constantly cites Mr. Moag's occasional statements in private e-mails or texts that bad or "interesting" information about Mr. Snyder was forthcoming, but he refuses to accept that Mr. Moag was referring to *other* misconduct by Mr. Snyder, not to any salacious details of sexual improprieties. Mr. Moag became aware of *financial* improprieties with WFI in the course of his representation of the team's minority owners, *see* ECF 31-1, at ¶ 8, and that was the information that he anticipated might be revealed although he himself was not planning to reveal it. Mr. Moag knows nothing of Mr. Snyder's sexual conduct or misconduct and he has repeatedly stated that he does not believe the India stories in particular and has described them as "National Enquirer" tabloid rumors. *Id.* at ¶ 5.

But Mr. Snyder will not accept yes for an answer if it means that he has to terminate his right to discovery. He filed a motion to compel, which this Court granted in part. Respondent continued to produce responsive materials, however irrelevant they may have been to the actual India defamation action, as and when he discovered them. Mr. Moag produced in unredacted form a record of every phone call placed to or from his cell phone between January and November, 2020. When Mr. Snyder's counsel complained that the phone bills showed another phone being paid for by Mr. Moag, Mr. Moag produced the unredacted records from that cell phone – even

though it was a phone used exclusively by his wife. And because Respondent cannot afford to litigate endlessly with Mr. Snyder, Respondent agreed to produce the entirety of the contents of Mr. Moag's personal iPhone and iPad to a third-party vendor chosen by Mr. Snyder, even though other courts have concluded that personal or attorney searches were sufficient. *See* Ex. 1, at 9-10. That meant that Mr. Moag produced to the vendor 11,591 documents, including completely personal materials like family communications. Respondent also agreed to permit its telephone provider, Comcast, to release copies of its telephone records for the period between April 1, 2020, and November 6, 2020. Ex. 2, at Ex. A ¶ 8; Ex. 16.

Respondent's agreement to produce these materials was expressly conditioned on Petitioner's promise to pay all costs of the discovery vendor. *See* Ex. 2, at 1 (letter agreement with FTI). Yet Petitioner now reverses course and demands that the Court order Respondent to pay those costs. Respondent's agreement was further conditioned on entry of a reasonable protective order, and retention of control over all materials not responsive to the subpoena. Respondent agreed that the vendor could run specific searches on the contents of those devices for any material that might have been relevant to the India litigation. *See id.* Finally, the parties expressly agreed that "Upon production of materials generated by this imaging agreement and resolution of any objections, document discovery in Snyder 1782 action is concluded, and Moag & Co. has no further obligation to produce materials. Motion for show cause order and other relief will be withdrawn by Petitioner and dismissed with prejudice." Ex. 2, at Ex. A ¶ 8.

When the electronic searches that Petitioner requested from the vendor turned up very few responsive documents, Mr. Snyder began accusing Mr. Moag of deleting responsive texts. He made this allegation chiefly on the premise that Mr. Moag had *already produced* certain texts in photographic form that did not appear in electronic form when the vendor applied the agreed-upon

15

search terms. Mr. Moag responded that although he routinely deletes texts from his personal phone, he deleted no responsive materials that had not already been produced in some form to Mr. Snyder. Mr. Snyder did not identify any missing responsive documents. Instead, Mr. Snyder asked Respondent for permission to have the vendor re-search the device contents for the "lost" texts, and Respondent consented. Still dissatisfied, Mr. Snyder asked to interview Mr. Moag under the following terms:

1. Mr. Moag will agree to provide full and truthful responses to the questions posed.

2. We reserve the right to request that Mr. Moag's responses be put in affidavit form for use in the Indian proceedings.

3. By proceeding with this alternate method of discovery, Mr. Snyder does not waive, and expressly reserves, the right to take the deposition of Mr. Moag and/or move for sanctions in connection with potential spoliation issues. *Should we ultimately proceed with items 1 and 2 above, we would expect to exchange releases with Mr. Moag and Moag & Co., and discontinue the 1782 with prejudice, but are not doing so at this time.*

Ex. 3, at 2 (emphasis added). Respondent agreed to these terms, and Mr. Moag answered questions from Mr. Snyder's counsel in a Zoom interview that lasted roughly two hours.

In that interview, Mr. Moag explained his general distaste for texting and his ordinary practice of deleting most texts shortly after they were sent or received. Mr. Moag did not say that he withheld or knowingly deleted any texts that were responsive to the subpoenas. On the contrary, Mr. Moag produced all texts (and other documents) that were responsive to the subpoenas that he possessed after the subpoenas were served, including some that were apparently deleted from his iPhone (whether automatically or manually he does not know), but which temporarily re-appeared on his iPad and were produced photographically to Petitioner.

After receiving Mr. Moag's phone records, Mr. Snyder saw an opportunity to harass another enemy, former WFT general manager Bruce Allen, because the records reflect about 21

hours of telephone conversations between Mr. Moag and Mr. Allen in 2020. That the two men have been friends for over 25 years is of no significance to Mr. Snyder, who prefers to believe that one or both of them must have been talking about planting false stories of Mr. Snyder's connections to Jeffrey Epstein in obscure India websites. As noted above, Mr. Snyder then filed a § 1782 petition against Mr. Allen, thereby generating a new round of stories in key publications that disparaged both Respondent and Mr. Allen. *E.g.*, John Keim, *Washington Football Team owner Daniel Snyder files motion against former team president Bruce Allen*, ESPN.com (Apr. 15, 2021); Chris Cwik, *Washington owner Dan Snyder files motion to depose former GM Bruce Allen*, Yahoo!sports (Apr. 15, 2021) ("Snyder believes [calls between Moag and Allen are] relevant because he thinks Moag may have been one of the sources for 'damaging information.'").

### G.    Mr. Snyder misleads the India court and the U.S. media about material obtained in this action.

On February 22, 2021, Mr. Snyder filed an "Urgent Application" in the High Court of Delhi "seeking to place on record additional documents." Ex. 17, at 3. Citing "new documents" obtained in this action, the application stated:

> text messages and emails … both show Mr. John Moag, who is the investment banker to the 3 minority owners of the Washington Football Team (hereinafter "Team") … having advance knowledge of negative publicity coming out about the Plaintiff and the Team. It is pertinent to mention that negative publicity created by the Defendants is the subject of the present suit. That in the discovery proceedings mentioned hereinabove, it was also uncovered that Mr. Moag's phone records show that he spoke with the attorney for Jeff Bezos, the CEO of Amazon and owner of the Washington Post. Mr. Moag's phone records also show that he exchanged 87 telephone calls, spanning well over 1,320 minutes (i.e., over 22 hours), with one Mr. Bruce Allen, the former President and General Manager of the Washington Football Team at a time when Mr. Allen was no longer employed by the Team.

Ex. 17, at 6. As support for Mr. Moag's "advance knowledge of negative publicity," Mr. Snyder attached a text string between Mr. Moag and a person whose name was redacted by Mr. Snyder.

In the string, Mr. Moag stated on July 3, 2020: "Keep an eye on the Redskins, it's getting very interesting," and the person responded, "Hopefully Snyder's going." *Id.* at 14. The obvious inference from this paragraph is that Mr. Moag was working with Jeff Bezos, the owner of the *Washington Post* and with a former team executive to engage in a "corrupt disinformation campaign" about Mr. Snyder. And indeed, the same day Mr. Snyder made this filing in India, *Front Office Sports* published an article about it in the United States. Ex. 18. The headline, as Mr. Snyder undoubtedly intended, was "Jeff Bezos Linked to Washington Football Team Sales Talk"—a convenient way for Mr. Snyder to discredit the *Post* stories that already had been published and others that he knew to be coming. The article quoted the text string between Mr. Moag and "a person" whose name was redacted to suggest that Mr. Moag had "advance knowledge of MEA WorldWide's 'corrupt disinformation campaign ….'" *Id.*, at 2. And the article stated that "Moag and Allen also exchanged text and email messages that 'prove' the two were 'focused on negative publicity directed at [Snyder],' according to the filing." *Id.*, at 3. Numerous articles in other outlets followed the one in *Front Office Sports*, further damaging Respondent's business reputation.

But as Mr. Snyder knew when he made this filing, the "person" whose name was redacted was not Mr. Bezos or any of his representatives. Nor was it any other potential purchaser of the WFT minority interests. The unnamed person, which was known to Mr. Snyder, was a U.S. Congressman who also happens to be a longtime fan of the WFT (but like most fans, not an admirer of the team's owner).

## III.   ARGUMENT

### A.   Respondent did not spoliate evidence.

Petitioner characterizes his filing as a motion for sanctions for spoliation under Rules 37 and 45(g). As the movant, Mr. Snyder bears the burden of showing that:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Victor Stanley, Inc.* v. *Creative Pipe, Inc.*, 269 F.R.D. 497, 520-21 (D. Md. 2010). Plaintiff has not met his burden with respect to any of these elements.

### 1. Petitioner has not identified any "evidence" that Respondent had an obligation to preserve, much less evidence that a reasonable factfinder could conclude supported Respondent's claims.

The first and third prongs of the test for spoliation can be considered together. The first prong applies to "evidence," meaning material that is potentially relevant to the claim in litigation. The third prong narrows that definition by requiring a showing that the lost evidence would have supported Respondent's claim. The claim at issue here is Petitioner's defamation action in India; i.e., the assertion that an Indian website defamed Mr. Snyder by publishing two articles linking him to Jeffrey Epstein and sex trafficking.

At the outset, Petitioner's motion fails completely because *he cannot identify any lost evidence*. To be clear, Petitioner possesses screen shots of the very texts he claims are lost. His complaint, apparently, is that he does not have these texts in electronic format. But he does not need the texts in electronic format for evidentiary purposes. If those texts were remotely admissible in India – and Petitioner has not explained why they would be – he could admit them through screen shots. Mr. Moag has already explained the texts to Petitioner's counsel in a two-hour voluntary interview, and Petitioner has all the information he reasonably could want with respect to those texts.

19

Even if these texts were considered lost, Petitioner has not established why they are "evidence" in the India proceeding, much less evidence that would have supported his claims. Petitioner's apparent theory is that Respondent planted the stories in the India publication or at least knows about someone who did. But Petitioner has not identified any document or other piece of evidence that remotely suggests that Respondent had anything to do with the India stories. The texts that Respondent (briefly) discusses have nothing to do with the India stories – except, in one case, to indicate Mr. Moag's surprise when he first saw the MEAWW article *after* it was published. The other strings relate to the *Washington Post* stories, which have already been held to be irrelevant to the India action by a Magistrate Judge in Colorado. *See* Ex. 1. Moreover, Mr. Moag's communications about those stories were consistent with the knowledge of many persons that the Post had interviewed or sought to interview about its investigations into the culture of sexual harassment and misconduct over many years at the WFT. In short, Petitioner has utterly failed to meet his burden that Respondent spoliated any document that qualifies as evidence in the India action.

### 2.   Respondent did not destroy any document with a "culpable state of mind."

Petitioner's motion assumes that Respondent was barred from deleting all texts and that any deletion qualifies as spoliation. That assumption is incorrect for multiple reasons.

First, Petitioner fails to appreciate that Respondent made no deletions from *Respondent's* devices; i.e., Moag & Co. servers and computers. All responsive documents from those devices were produced without alteration or deletion, and were not later deleted. The documents at issue are limited to texts (not e-mails or other documents) that resided on Mr. Moag's *personal* devices. Petitioner's subpoena did not apply to Mr. Moag in his personal capacity, and nothing required

him to cease his routine practice of deleting personal texts on his personal devices, either before or after the subpoena was served.

Second, the subpoena was not served until October 9, 2020, which was several weeks after virtually all the texts at issue were sent or received. Prior to October 9, Mr. Moag had no obligation to preserve texts, including texts that Petitioner now claims are relevant to his India litigation. Mr. Moag does not recall when he deleted any particular text, but in all likelihood the deletions occurred before October 9. The only reason why Petitioner has those texts at all is because Mr. Moag noticed, after he searched his iPhone and produced responsive materials, that some responsive texts appeared when he opened a text messaging application on his iPad. Mr. Moag did not use his iPad for texting and did not even realize that the iPad might have stored some texts by synching with his iPhone. When he saw those texts appear on his iPad, he was worried that the synchronization protocol would delete them as well, so he took photographs of the texts and sent them to his counsel, who produced them to Petitioner. Mr. Moag does not specifically recall deleting any texts from his iPad thereafter, and it seems likely that they auto-deleted long before the third-party vendor took an image of Mr. Moag's devices. Petitioner has not tried to explain, nor could he explain, how this conduct establishes a culpable state of mind.

Third, even if Mr. Moag knowingly or unknowingly deleted a responsive text, his deletion occurred *after he had already produced screenshots of the texts*. Producing a screenshot of a text is substantial compliance with the subpoena, as the District of Colorado has already concluded in a related § 1782 petition. Petitioner never complained about receiving these screenshots until he found out, much later in connection with a search for *unproduced* texts, that the produced texts no longer appeared electronically on Mr. Moag's devices. And Petitioner cites no case suggesting that a third-party witness must continue to preserve evidence after it produces that evidence to the party

21

that issued the subpoena. On the contrary, a subpoena recipient, unlike a party, "is under no duty

to supplement its discovery responses." *Discover Fin. Servs., Inc.* v. *Visa U.S.A., Inc.*, 2006 WL

8460949, at *2 n.1 (S.D.N.Y. Aug. 3, 2006) (citing *Alexander* v. *F.B.I.*, 192 F.R.D. 37, 38 (D.D.C.

2000); *see also AXIS Ins. Co.* v. *Terry*, 2018 WL 9943824, *3 (N.D. Ala. Jan. 23, 2018); *In re 3M

Combat Arms Earplug Prods. Liab. Litig.*, 2020 WL 6531421, *3 (N.D. Fla. Nov. 5, 2020).

### B.     Petitioner waived the relief requested by the motion for sanctions.

When Petitioner demanded that Respondent produce his personal devices for inspection by

a third-party discovery vendor, Respondent knew that it could object and litigate the matter before

the Court. But Respondent also knew that further litigation with Mr. Snyder would be wasteful

and exceedingly expensive. So Respondent negotiated an agreement in which it would produce

Mr. Moag's personal devices for searches by a discovery vendor, but in return Respondent

demanded an end to Mr. Snyder's intrusive discovery. The parties expressly agreed as follows:

> **Termination of document discovery.** Upon production of
> materials generated by this imaging agreement and resolution of any
> objections, *document discovery in Snyder 1782 action is concluded,
> and Moag & Co. has no further obligation to produce materials.
> Motion for show cause order and other relief will be withdrawn by
> Petitioner and dismissed with prejudice*. Following the termination
> of document discovery and during a period not to exceed 60 days
> thereafter, Petitioner will retain the right to take a deposition of Mr.
> Moag, not to exceed the 7 hour duration limit imposed by Fed. R.
> Civ. P. 30(d)(1), on a day convenient to the parties and counsel.
> Prior to the termination of document discovery, Petitioner and Moag
> & Co. will jointly draft a letter request to Comcast to obtain copies
> of Moag & Co.'s office phone records for the time period of April
> 1, 2020 to November 6,2020. In the event that Petitioner is unable
> to obtain the requested records after submitting a joint letter request,
> Moag & Co. will agree to stipulate that it consents to the production
> of the aforementioned phone records by Comcast and Petitioner
> reserves the right to go to court to seek permission to serve a
> subpoena on Comcast to obtain those records.

Ex. 2-A, at ¶ 8 (emphasis added). When the parties entered this agreement, Petitioner was well

aware that Mr. Moag routinely deleted text messages from his personal devices. Nothing in the

parties' agreement remotely suggests that Petitioner would be permitted to move for sanctions if Petitioner concluded that Mr. Moag had deleted text messages, a fact he already knew.

Respondent complied with the terms of the parties' agreement by producing his personal devices for imaging and by permitting the vendor to produce to Petitioner the documents responsive to the agreed-upon search terms. That compliance established that "Moag & Co. has no further obligation to produce materials." Further, it obligated Petitioner to withdraw his motion for show cause order and other relief *with prejudice*. And the parties expressly agreed that Mr. Snyder would pay the expenses of the third-party vendor – obviously Respondent never would have agreed to produce his personal devices if Petitioner could later argue that Respondent should pay those expenses merely because Petitioner concluded that Mr. Moag had deleted texts from his personal devices. By filing a motion for sanctions, Petitioner is openly breaching his obligations under the parties' agreement. Petitioner knowingly waived any right to seek sanctions against Respondent, and for that additional reason the motion for sanctions should be denied.

> **C.**     **If the Court is at all inclined to grant Petitioner's motion, the Court should first give Respondent leave to serve document requests and a notice of deposition to determine if Petitioner is improperly using the courts to harass Respondent and generate favorable publicity for himself.**

One of the recognized problems with § 1782 actions is their lack of parity: the petitioner is given an opportunity to take discovery without having to face discovery from the respondent, or from the adversary in the foreign litigation. Because this procedure can lead to abuse, courts have discretion to permit reciprocal discovery from the petitioner in appropriate cases. *See Intel Corp.* v. *Advanced Micro Devices, Inc.*, 542 U.S. 241, 262 (2004); *Euromepa S.A* v. *R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995).[2] In addition, this Court has authority under Rules 11 and 26(g)

---

[2] Section 1782 by its terms permits discovery in the United States "for use" in a foreign proceeding. Although Respondent is not a named party to the India litigation, Petitioner's recent "Urgent Application" alleges, incorrectly, that Respondent here assisted the Indian defendants in a planned campaign to plant false news stories about Petitioner.

23

to impose an appropriate sanction on Petitioner when a pleading, motion, other paper, or discovery request is interposed "for any improper purpose, such as to harass." Filing court papers to generate favorable publicity (or to engender negative publicity for the party's perceived enemies) rather than to vindicate rights is one factor to consider in the "improper purpose" calculus. *See In re Kuntsler*, 914 F.2d 505, 520 (4th Cir. 1990). Because a § 1782 petition against a third-party to the foreign litigation has no adverse party with clear reciprocal rights of discovery, the ordinary checks on abusive litigation behavior are largely unenforceable unless the Court gives the § 1782 respondent leave to conduct their own discovery. It is within the Court's inherent power to order discovery in aid of determining whether Petitioner has violated Rules 11 or 26(g) or other obligations to the Court. *Cf. Kuntsler*, 914 F.2d at 520 (evidentiary hearing may be necessary to determine whether paper was filed for improper purpose, such as to generate publicity).

This case is the epitome of what many commentators have feared about the potential for abuse of § 1782 proceedings. Petitioner, who is disparaged and maligned every day in U.S. publications and other media outlets, chooses to file a foreign lawsuit against an obscure defendant that reprinted rumors circulating in the U.S. Petitioner well knows that the potential sources of those rumors include virtually every football fan in the 202, 301 and 703 area codes, for starters. But by filing a foreign lawsuit, Petitioner acquired a "right" to harass select enemies in the United States and to appear in the media as though he is defending his reputation. The targets of his § 1782 petitions are not parties in India and are only nominal parties in the U.S. proceedings, with no clear right to fight back. Respondent here has now been openly disparaged by Petitioner in his

---

*See* Ex. 17. Accordingly, Respondent should be permitted to "use" discovery from Mr. Snyder to rebut his false allegations in the India proceedings, should the need arise, even though Respondent is not a party in India and does not consent to jurisdiction there.

India case, as well as in at least three § 1782 petitions filed by Mr. Snyder. Yet he has no automatic right of discovery in any of them.

Reciprocal discovery is appropriate here because Respondent has demonstrated a good-faith belief that Petitioner is purposely and improperly sending his filings to favored reporters for the purpose of generating publicity. In the most egregious instance, a reporter published a story about the Petition filed in this case before it was officially docketed and while it was apparently filed under seal. *See supra* Part II.D. The only plausible inference is that Petitioner or his agents sent a sealed document to the press covering Respondent's industry, expecting it to generate negative publicity about Respondent before Respondent had even seen it. More recently, Petitioner filed highly misleading papers in his India litigation based on documents he received in discovery from Moag & Co., which generated same-day stories in the United States slandering Respondent. The instant motion for sanctions generated a press inquiry to Mr. Moag seven minutes after it was filed, and a news story about an hour later. And Petitioner's § 1782 petition against Bruce Allen generated a cluster of news stories disparaging both Respondent and Mr. Allen.

Mr. Snyder's apparent pattern of making inflammatory accusations in litigation papers and then pushing them out to industry news reporters is exceedingly harmful to Respondent. But because the court filings are cloaked in litigation privilege and because Respondent is not a true party in any litigation matter, Respondent has no access to compulsory process to rebut them. If Mr. Snyder is in fact making these false or misleading filings for the purpose of generating favorable publicity for himself or harassing Respondent, that would be an improper purpose that ought to subject him to sanctions.

Fairness dictates that Respondent should be given leave to seek documents and testimony from Petitioner concerning the following topics:

1. All direct or indirect communications between Mr. Snyder or persons working for him or WFT (including lawyers, private investigators, and public relations firms) and members of the media, if such communications refer or relate to Mr. Moag, Moag & Co., or any other respondent of a § 1782 petition filed by Mr. Snyder in support of his India defamation action.

2. All direct or indirect communications between Mr. Snyder and persons working for him or WFT (including public relations firms), if such communications refer or relate to publicizing information about Mr. Moag, Moag & Co., or any other respondent of a § 1782 petition filed by Mr. Snyder in support of his India defamation action.

3. All documents or information referring or relating to Mr. Snyder's plan to rebut, minimize, or divert attention from actual or anticipated stories in the media that accuse Mr. Snyder or WFT of sexual misconduct or acquiescing in sexual misconduct.

4. All filings made by Mr. Snyder and his counsel in the India defamation action which refer to or include information or documents obtained by Mr. Snyder as a result of § 1782 petitions filed by Mr. Snyder in support of his India defamation action.

Accordingly, Petitioner requests, in the alternative, that he be given leave to serve a document request and notice of deposition on Petitioner covering these topics.

## IV.    **CONCLUSION**

For the reasons stated, Respondent Moag & Co., LLC, respectfully requests that the Court deny the application for sanctions, and issue an order rebuking Petitioner Daniel Snyder for abusing this Court's discovery process. In the alternative, Respondent respectfully requests that the Court grant him leave to take discovery from Petitioner.

Respectfully submitted,

ZUCKERMAN SPAEDER LLP


By:  /s/ *William J. Murphy*
      ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

William J. Murphy (#00497)
John J. Connolly (#09537)
100 E. Pratt St., Suite 2440
Baltimore, Maryland 21202
(410) 332-0444
(410) 659-0436 (fax)
wmurphy@zuckerman.com
jconnolly@zuckerman.com

*Attorneys for Respondent*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of May, 2021, a copy of the foregoing was

electronically filed and served on all counsel of record via ECF or by e-mail if filed under seal.

/s/ *John J. Connolly*

_____